[This opinion has been published in *Ohio Official Reports* at 82 Ohio St.3d 144.]

THE STATE OF OHIO, APPELLEE, *v.* MASON, APPELLANT.

[Cite as *State v. Mason*, 1998-Ohio-370.]

*Criminal law—Aggravated murder—Evidence—Due process requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense, when—Death penalty upheld, when.*

Due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial. (*State v. Broom* [1988], 40 Ohio St.3d 277, 533 N.E.2d 682, approved and followed.)

(No. 97-239—Submitted February 17, 1998—Decided June 17, 1998.)

APPEAL from the Court of Appeals for Marion County, Nos. 9-94-45 and 9-94-51.

———————————

{¶ 1} On February 13, 1993, sheriff's deputies found the battered body of nineteen-year-old Robin Dennis inside an abandoned building in a rural area of Marion County near Pole Lane Road. Robin, lying face down, was wearing only a bra. Her jeans and panties were positioned around her ankles and lower leg. Eight feet from Robin's body detectives found her jacket, with burrs and debris on it. Her T-shirt and car keys were under the coat.

{¶ 2} The apparent murder weapon, a blood-stained board with protruding nails, was lying some twenty feet from her body. Hair adhering to another piece of wood found at the scene matched Robin's hair.

{¶ 3} After an autopsy, pathologist Dr. Keith Norton concluded that Robin died as a result of blunt force trauma causing multiple skull fractures. Dr. Norton found eight distinct lacerations on Robin's head. Robin also suffered a black eye and bruises on her head, face, and body. She had been strangled, possibly causing unconsciousness, but she did not die of strangulation. In Dr. Norton's view, the blood-stained board found at the scene could have caused her injuries, but some injuries may also have been caused by the butt of a revolver.

{¶ 4} Dr. Norton found no trauma to the victim's genitalia, but he found sperm in her vagina. He testified that sperm can remain six to twelve hours after intercourse in the vagina of a woman doing normal activities.

{¶ 5} According to DNA experts called by the state, material taken with vaginal swabs from the victim matched the DNA of appellant Maurice Mason. As to this material, a DNA match could be expected from only one in eight thousand three hundred people of the same race as Mason. DNA material from Robin's panties also matched Mason's DNA, and the odds against a similar DNA match among individuals of his race were four million to one. Roughly comparable odds existed as to other races. Experts did not find DNA from anyone other than the victim and Mason.

{¶ 6} Dr. Richard Durbin, the coroner who examined the body at the scene, believed Robin had been killed at the scene and had been dead for several days. From her appearance and injuries, Dr. Durbin thought Robin had been raped or sexually molested.

{¶ 7} Robin's body was found within eighteen minutes' walking distance of where her abandoned car had been found stuck in a farm field three days earlier. On the inside of the passenger door, a police technician found type B blood, Robin's blood type.

{¶ 8} On the outside passenger car door and on the passenger's side of the dash, a forensic investigator found what appeared to be chevron style tennis shoe impressions. The state established that Mason owned shoes bearing similar chevron

2

designs and that Robin Dennis's shoes with a similar chevron design were found at the crime scene. The prosecutor later argued that the location of the marks and blood inside the car were consistent with a struggle having taken place in and around the car.

{¶ 9} A set of keys, including car keys that fit a 1981 Chrysler belonging to Mason's wife, were on the car's front passenger seat.

{¶ 10} Thomas Forster, a farmer, testified that he saw a person fitting Mason's description walking in his fields towards Pole Lane Road around 4:10 p.m. on February 8, the date of Robin's disappearance. That location was a seven-to-nine-minute walk from the building where Robin's body was later found, and approximately a seventy-minute walk from where Mason lived. The man Forster observed was black, weighed about two hundred pounds, and was wearing jeans, a jacket, and a bandanna on his head. Mason is black, weighed two hundred fifteen pounds, and was wearing a bandanna earlier that day.

{¶ 11} Around 4:15 p.m., Deputy Sheriff Jack Lautenslager noticed a black man walking along Pole Lane Road. The man was wearing a dark jacket and a blue bandanna with white specks. Lautenslager later identified Mason as the man he saw on February 8 by choosing his photo from a group of five or six photos.

{¶ 12} Around 4:30 p.m. that same afternoon, Francis Forster, Jr., farmer Forster's brother, noticed a light-colored compact car in a field near New Road. Two days later, on February 10, Forster saw sheriff's deputies inspecting the same car, still in the field.

{¶ 13} On February 15, detectives found a small blood-stained piece of metal at the crime scene. A firearms examiner concluded that this piece of metal was identical in size, shape, and design to a grip-frame from a Colt .22 caliber Frontier Scout Revolver and was consistent with having come from the handle of such a revolver. A similar weapon had been the subject of an agreement between Robin's husband and Mason under which the gun would be traded for Mason's television.

**{¶ 14}** A technician found type B blood, Robin's blood type, on the side of a tennis shoe Mason was wearing on February 12. Approximately eleven percent of Caucasians and twenty percent of blacks have type B blood.

**{¶ 15}** Trial testimony established Robin's activities prior to her death. On February 7, Robin and her husband, Chris Dennis, drove to the home of friends Mike and Carol Young in Marion and stayed overnight. Chris brought a Colt .22 caliber Frontier Scout revolver with him.

**{¶ 16}** On February 8, Robin and Chris went to the Marion office of H & R Block. Later they stopped at the home of Rick McDuffie, whom Chris knew. Mason, who was acquainted with the victim's husband and was McDuffie's cousin, also was present at the McDuffie house. According to the testimony of several state witnesses, Robin, Chris and Mason later returned together to the Young house.

**{¶ 17}** While there, Chris and Mason discussed trading Chris's Colt revolver for Mason's TV. State witnesses testified that Mason and Robin left the Youngs' house in Robin's car around 3:00 p.m. on February 8 to pick up Mason's television set. Before Robin and Mason left, Chris passed out intoxicated in the living room of the Youngs' house and did not awake until later that evening after they were gone.

**{¶ 18}** Robin never returned, and Chris Dennis's gun was never seen again. Despite Mason's admission that he discussed trading his television for the gun with Chris, he claimed that the trade never occurred and that he never had the gun.

**{¶ 19}** Mason's testimony as to his activities on the date of Robin's disappearance conflicted with that of the state's witnesses. Mason testified that he first met Robin in September 1992, and that they had spent a night together and engaged in consensual sex. He claimed that they had had sex a few times since then. He testified that on the date Robin disappeared, he had consensual sex with her around 10:30 a.m. at Rick McDuffie's house, and that later Chris and Robin dropped him off at his home around 3:00 p.m., after which he went walking, and that he never saw Robin after that.

4

{¶ 20} Mason said that between 3:00 and 5:00 p.m. on that day, he visited Gerald Gorham at a laundromat, and drank with him at a park. Gorham corroborated Mason's visit, but did not know on which day it occurred.

{¶ 21} Sandy Childers testified that she saw Mason after 5:00 p.m., when he was out walking, then picked him up around 5:20 p.m. and drove him to his home. Mason later walked over to Sandy's, where he spent the evening, and others confirmed that Mason arrived at Sandy's between 6:00 p.m. and 7:00 p.m.

{¶ 22} Mason admitted that he had initially told police that he was home after 2:30 p.m. on February 8, and that when his wife came home at 4:15 p.m., they went to the YMCA. He also initially denied to police that he had ever been alone with Robin.

{¶ 23} At trial Mason admitted that the keys discovered in Robin's abandoned vehicle were his, but claimed that police took them from him when he was taken into custody on February 12, 1993. Police inventory records, however, indicated that Mason had no keys with him on February 12.

{¶ 24} Moreover, February 10 photos of the car's interior indicate that Mason's keys were the keys found in Robin's car that day. Also, on February 11, police towed the car to a city garage and, on February 12, disassembled the car (door, seats and dash removed). Since the car was never reassembled, the photos could not have been taken after the February 12 disassembly.

{¶ 25} Mason claimed that he did not, on February 8, wear the tennis shoes introduced as evidence by the state. He testified that his brothers and father had also worn his shoes. He theorized that the blood found on his shoe might have come from his father. He testified that he had previously worked at a slaughterhouse, and he speculated that the blood may have come from coworkers at a slaughterhouse who had cut themselves and might have bled on his shoes.

{¶ 26} Mason denied that he had been in the vicinity of the crime scene on February 8, and denied killing Robin. On cross-examination, Mason asserted, "I

didn't kill her, and her husband [Chris Dennis] did. I know that. You know that, and everybody else knows that."

{¶ 27} In 1984, Mason had been convicted of burglary and thus had a prior conviction for an offense of violence and could not legally possess firearms. In 1988, Mason was also convicted of drug trafficking.

{¶ 28} Mason was indicted, tried by jury, and convicted of aggravated felony murder, rape, and having a weapon while under disability. He was further found guilty of the death-penalty specification of committing murder in the course of a rape, and further specifications involving firearms, prior felony, and prior offense of violence. Thereafter the jury returned a recommendation that he be sentenced to death, and that recommendation was accepted by the trial court.

{¶ 29} The court of appeals affirmed Mason's convictions and death sentence, and the cause is now before this court upon an appeal as of right.

_____

*Jim Slagle*, Marion County Prosecuting Attorney, for appellee.

*William F. Kluge* and *David C. Stebbins*, for appellant.

_____

**MOYER, C.J.**

{¶ 30} Mason has raised twenty-two propositions of law. We have reviewed each, and, for the reasons stated below, we find that none justifies reversal of Mason's convictions. We have fulfilled our responsibilities to independently review the record, weigh the aggravating circumstances against the mitigating factors, and examine the proportionality of a sentence of death in this case. Upon full review of the record, we affirm Mason's convictions and death sentence.

I

Denial of Experts

**{¶ 31}** Mason argues that the trial court violated his constitutional and statutory rights by failing to provide adequate funds for investigative and expert assistance, despite the fact that he was provided funds for obtaining the services of a private investigator, a forensic psychiatrist, and a forensic pathologist, and for blood and DNA testing. He contends that the trial court should have also provided funds to enable him to hire (a) a soils and trace evidence expert, (b) an expert on shoeprints, (c) an eyewitness identification expert, (d) a social worker or mitigation expert, (e) a homicide investigation expert, (f) a mass media expert, (g) a forensic psychologist, (h) a statistical DNA expert, and (i) a firearms expert.

**{¶ 32}** As a matter of due process, indigent defendants are entitled to receive the "raw materials" and the " 'basic tools of an adequate defense,' " which may include provision of expert psychiatric assistance. *Ake v. Oklahoma* (1985), 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53, 62 (quoting *Britt v. North Carolina* [1971], 404 U.S. 226, 227, 92 S.Ct. 431, 433-434, 30 L.Ed.2d 400, 403). The *Ake* court held that provision of an expert to a defendant was required when necessary to prepare an effective defense based on his mental condition, when his sanity at the time is seriously in question.

**{¶ 33}** While *Ake* involved the provision of expert psychiatric assistance only, the case now is generally recognized to support the proposition that due process may require that a criminal defendant be provided other types of expert assistance when necessary to present an adequate defense. Pursuant to *Ake*, it is appropriate to consider three factors in determining whether the provision of an expert witness is required: (1) the effect on the defendant's private interest in the accuracy of the trial if the requested service is not provided, (2) the burden on the government's interest if the service is provided, and (3) the probable value of the additional service and the risk of error in the proceeding if the assistance is not provided. *Ake* at 78-79, 105 S.Ct. at

1093-1094, 84 L.Ed.2d at 63. Pursuant to the third of these factors, due process does not require the provision of expert assistance relevant to an issue that is not likely to be significant at trial. Nor does due process require that an indigent defendant be provided all the assistance that a wealthier counterpart might buy. Rather, he or she is entitled only to the basic and integral tools necessary to ensure a fair trial.

{¶ 34} Due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution, does not require the government to provide expert assistance to an indigent defendant in the absence of a particularized showing of need. Nor does it require the government to provide expert assistance to an indigent criminal defendant upon mere demand of the defendant. We observed in *State v. Broom* (1988), 40 Ohio St.3d 277, 283, 533 N.E.2d 682, 691, that, pursuant to *Ake* and its progeny, in order to establish a violation of due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, " 'a defendant must show more than a mere possibility of assistance from an expert. Rather, a defendant must show a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial.' " Quoting *Little v. Armontrout* (C.A.8, 1987), 835 F.2d 1240, 1244.

{¶ 35} Further, as a matter of statutory law, R.C. 2929.024 requires trial judges to grant funds in aggravated murder cases for investigative services and experts when "reasonably necessary for the proper representation" of indigent defendants. Such decisions are to be made "in the sound discretion of the court" based upon "(1) the value of the expert assistance to the defendant's proper representation * * * and (2) the availability of alternative devices that would fulfill the same functions." *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus. See, also, Sup.R. 20(IV)(D).

{¶ 36} Accordingly, we hold that due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of

the Ohio Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial.

{¶ 37} In applying these principles to the case before us, we conclude that Mason has not demonstrated that the trial court abused its discretion in denying him some funds for experts while allowing other funds.

{¶ 38} Soils Expert. Mason did not demonstrate a particularized need for a soils expert. At trial, Mason repeatedly made his primary point, namely, that the state produced no evidence of dirt or debris on his clothing showing that he had been walking through farm fields four days before. Mason did not need a soils expert to make that point.

{¶ 39} Even had a soils expert testified that dirt on Mason's shoes was not consistent with dirt found at the crime scene, the probative value of that evidence would have been minimal at best, in that the shoes were not taken by the police for several days after Robin's disappearance. Hence, Mason did not show that the fairness of his trial was dependent upon being provided a soils expert. *State v. Broom* (1988), 40 Ohio St.3d 277, 283, 533 N.E.2d 682, 691.

{¶ 40} Shoeprint Expert. Mason claims that the trial court erred in not granting his untimely request, made on the sixth day of trial, for a shoeprint expert. A police technician found impressions of a chevron design, possibly a shoeprint, on the Buick's dashboard and passenger door, which suggested a struggle. Both the victim and Mason wore tennis shoes with chevron soles, although the impressions were too faint to trace to any particular shoe.

{¶ 41} Both the state and the defense acknowledged, however, that Mason and Robin had both been in the car on February 8. The state argued that the shoeprints were relevant because they tended to support the state's contention that a struggle had

taken place in the car. Mason did not make a particularized showing that a shoeprint expert might have rebutted that inference or that a privately retained shoe expert would have been able to identify the shoeprints more specifically than could the state's experts.

{¶ 42} In the court of appeals, Mason complained only of the trial court's failure to provide him with a soils expert and a shoeprint expert. This court "will not ordinarily consider a claim of error that was not raised in any way in the Court of Appeals and was not considered or decided by that court." *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus. However, upon review in this capital case, we conclude that Mason's remaining claims as to funds for experts not pursued before the court of appeals also lack merit whether viewed on a plain-error basis or as a claimed abuse of discretion.

{¶ 43} Eyewitness Identification Expert. A trial court can legitimately refuse funds for an expert absent "a showing of demonstrable prejudice." *State v. Broom*, 40 Ohio St.3d at 284, 533 N.E.2d at 691. Mason made no such showing. The state did not rely solely on eyewitness identifications to link Mason to the murder of Robin Dennis. Rather the state presented other substantial evidence connecting Mason to those crimes.

{¶ 44} Defense counsel was able to fully and adequately cross-examine each of the eyewitnesses (Deputy Lautenslager, Francis Forster, and Thomas Forster), and thereby cast doubt on the accuracy of their recollections. Moreover, Mason did procure an expert on eyewitness identification without state funds. Because the jury heard his testimony and nevertheless convicted Mason, the trial court's refusal to provide funds for such an expert was harmless.

{¶ 45} The trial court acted within its discretion in denying funds for an expert on eyewitness identification to assist the defense in challenging the validity of the eyewitnesses' identification of Mason as the black male in the area of Robin's car on February 8.

**{¶ 46}** <u>Homicide Investigation Expert</u>. The trial court did not abuse its discretion in refusing to grant additional funds for the defense to obtain a second investigator for the purpose of critiquing the police investigation. Such funds were not necessary to ensure the fairness of Mason's trial, nor did Mason's request point to more than a mere possibility that such an expert might have been relevant to the defense. The trial court did allow funds for an expert investigator, and his investigation helped to produce over thirty defense witnesses in the trial phase.

**{¶ 47}** <u>Mass Media Expert</u>. The services of a mass media expert were not reasonably necessary for proper representation or to guarantee the fairness of Mason's trial. See *State v. Jenkins*, 15 Ohio St.3d at 193, 15 OBR at 336, 473 N.E.2d at 292 (sociologist to assist voir dire unnecessary); *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710, 723 (psychologist for jury selection unnecessary).

**{¶ 48}** <u>Firearms Expert</u>. Mason did not make a particularized showing of need for a firearms expert. A state expert witness did testify that a piece of metal found at the crime scene matched the characteristics of the grip-frame from a Colt revolver. Chris Dennis had such a gun, and the evidence indicates he had agreed to trade it to Mason for a television.

**{¶ 49}** But testimony from a traditional firearms expert would not have helped Mason. The compelling evidence on this point was simply the observable similarity between the crime-scene piece of metal and a grip frame from a Colt revolver, as well as a comparison photograph of the two items. Moreover, that evidence could equally incriminate Chris Dennis, and thus support the defense claim that Chris murdered his wife. Again, Mason failed to demonstrate an abuse of discretion.

**{¶ 50}** <u>DNA Statistical Expert</u>. Mason failed to demonstrate a need for a DNA statistical expert. Ultimately, Mason did not dispute the DNA test results. Provision of a DNA statistical expert would have been superfluous, and the absence of one did not render the trial unfair.

**{¶ 51}** <u>Forensic Psychologist</u>. Mason also failed to demonstrate an abuse of discretion in the denial of funds for a defense forensic psychologist. Cf. *State v. Powell* (1990), 49 Ohio St.3d 255, 256-258, 552 N.E.2d 191, 194-195; S*tate v. Esparza* (1988), 39 Ohio St.3d 8, 529 N.E.2d 192. Mason's mental status was not a central feature of the trial, as in *Ake v. Oklahoma.* Mason did secure the services of a psychiatrist, at state expense, although he decided, for tactical reasons, not to present that testimony.

**{¶ 52}** <u>Social Worker/Mitigation Expert</u>. Nor was Mason entitled to the assistance of a social worker or mitigation expert in the penalty phase as he claims. See *State v. Gumm* (1995), 73 Ohio St.3d 413, 427-428, 653 N.E.2d 253, 267. The defense team of two lawyers and an investigator looked fully into Mason's background. Moreover, the state had collected and released to the defense in January 1994 voluminous records concerning Mason, including records about his last nine years in and out of prison as well as school records and juvenile incarcerations. In fact, Mason deliberately chose not to present background mitigation evidence to avoid unfavorable rebuttal evidence from the state. Thus, Mason has again failed to demonstrate an abuse of discretion or outcome-determinative plain error.

**{¶ 53}** In sum, we reject Mason's contention that the trial court's refusal to provide him with all the experts he requested denied him his constitutional or statutory rights.

II

Suppression of Pretrial Statements

**{¶ 54}** Mason claims that the trial court erred in refusing to suppress statements he made during police interviews on February 10 and 12 because police did not advise him of his *Miranda* rights, and because his statements were involuntary. Although Mason made no directly incriminating statements, his pretrial account of his February 8 activities was used to demonstrate a conflict with his trial testimony as to events relevant to Robin's death.

**{¶ 55}** On February 10, Detective Dennis Potts stopped by Mason's house, drove him to the police station, asked him questions for eighteen minutes, then drove him home after driving by the Youngs' residence. On February 12, Potts again stopped at Mason's house and asked whether he would go to the police station for further interviews. Mason again voluntarily agreed. The ensuing conversations, all recorded, began at 11:29 a.m. and lasted until 3:24 p.m. Mason was cooperative and talked freely throughout.

**{¶ 56}** Around 4:00 p.m., police advised Mason of his *Miranda* rights, and his parole officer (who had secretly observed the interview) arrested him for violating the conditions of his parole by drinking and associating with felons. After Mason asked for an attorney, police stopped further questioning.

**{¶ 57}** Until he was told that he was under arrest, detectives never told Mason that he could not leave, and he was never handcuffed. Mason acknowledged that he was left alone two or three times, the door was not locked, and that the first time he understood that he would be arrested and could not leave was around 4:00 p.m.

**{¶ 58}** Only a custodial interrogation triggers the need for a *Miranda* rights warning. *Berkemer v. McCarty* (1984), 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317. The evidence supports the trial court's finding that Mason was not in custody when questioned.

**{¶ 59}** The fact that a suspect is being interviewed at a police station does not, *per se*, require a *Miranda* rights warning. Rather, the determination as to whether a custodial interrogation has occurred requires an inquiry into "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. at 442, 104 S.Ct. at 3151, 82 L.Ed.2d at 336. "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279, quoting *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719.

**{¶ 60}** Since Mason was not in custody, police did not violate his *Miranda* rights. See *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714; *California v. Beheler,* 463 U.S. at 1123, 103 S.Ct. at 3519, 77 L.Ed.2d at 1278; *State v. Biros* (1997), 78 Ohio St.3d 426, 440, 678 N.E.2d 891, 904.

**{¶ 61}** Moreover, evidence supports the trial court's finding that Mason's statements were voluntary. A court, in determining whether a pretrial statement is involuntary, "should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus.

**{¶ 62}** In this case, Mason was a thirty-year-old high school graduate who had taken some college courses. He had two prior felony convictions and was experienced with criminal investigations. He was not threatened, mistreated, coerced, or wrongfully induced to make statements. Moreover, questioning on February 10 lasted only eighteen minutes, and the February 12 questioning, although spread over four hours, included substantial periods of inactivity. Under the totality of circumstances, his pretrial statements in which he continued to maintain his innocence were

voluntary.  Compare *State v. Loza* (1994), 71 Ohio St.3d 61, 66, 641 N.E.2d 1082, 1094.

{¶ 63} The trial court did not err in finding that, during the initial two interviews on February 10 and February 12, 1993, the defendant was not in custody and therefore the officers were not required to provide him with *Miranda* warnings. Nor did the trial court err in finding the statements to have been voluntarily made.

III

Denial of Continuance

{¶ 64} Mason argues that the trial court erred in failing to grant his counsel's requests for reasonable continuances in order to investigate and prepare for trial.  His claim lacks merit.

{¶ 65} "The grant or denial of a continuance is a matter that is entrusted to the broad, sound discretion of the trial judge." *State v. Unger* (1981), 67 Ohio St.2d 65, 21 O.O.3d 41, 423 N.E.2d 1078, syllabus.  In both *State v. Spirko* (1991), 59 Ohio St.3d 1, 17, 570 N.E.2d 229, 249, and *State v. Landrum,* 53 Ohio St.3d at 115, 559 N.E.2d at 721, this court held that the trial court did not abuse its discretion in denying a continuance despite counsel's claims that they needed more time to prepare.  In *State v. Johnson* (1986), 24 Ohio St.3d 87, 94-95, 24 OBR 282, 288-289, 494 N.E.2d 1061, 1067-1068, the trial court was found to have abused its discretion in denying a continuance, but *Johnson* involved newly discovered evidence, a situation not present here.

{¶ 66} On January 19, 1994, the prosecutor released approximately three thousand pages of Mason's institutional records to defense counsel, which the prosecutor claims were not subject to discovery.  The trial judge stated that after release of the records, both the prosecutor and the defendant agreed to May 31, 1994 as a firm trial date.

{¶ 67} On May 23, 1994, Mason moved for a continuance on the basis that the state had disclosed two days earlier an additional four hundred eleven pages of

relevant police investigative reports and witness statements. Mason's counsel argued that more time was needed to study, analyze, and follow up on this mass of information. The court denied the motion on May 27.

{¶ 68} At the start of voir dire, on May 31, Mason's lead counsel renewed his arguments for a continuance, declaring that he was unprepared to go forward and would not do so. After hearing his explanations, the trial court expressed skepticism as to the legitimacy of the need for continuance. When the court threatened to remove counsel without pay, counsel agreed to proceed to trial.

{¶ 69} The trial court did not abuse its discretion in determining that Mason's counsel had been allowed adequate time to review the witness's statements, police investigative files, and other materials that were furnished to him. His two appointed counsel first appeared at pretrial hearings in October 1993, eight months before trial began on May 31, 1994.

{¶ 70} In addition to two counsel, the trial court also granted the defense funds for a trained investigator, a psychiatrist, pathologist, and for blood and DNA testing. Counsel received additional assistance from the State Public Defender's Office. Prior to trial, Mason filed more than fifty pretrial motions and conducted several pretrial hearings. At trial, he called thirty-one witnesses. Contrary to Mason's claim, counsel had more than enough time to prepare, and the record demonstrates extensive preparation.

{¶ 71} In sum, Mason has not demonstrated that the court abused its discretion in denying defense motions for continuance made only eight days before the scheduled trial date and on the morning of trial. Nor has Mason demonstrated that his counsel needed more time to effectively represent him.

IV

Jury Selection Issues

{¶ 72} Mason contends that the trial court and defense counsel erred in voir dire by referring to the jury's sentences verdict as a recommendation. Although the

term "recommendation" was used briefly in voir dire and in final instructions, the judge and counsel generally avoided the term. Further, we have previously held that use of the term "recommendation" does not constitute error. See, *e.g.*, *State v. Davie* (1997), 80 Ohio St.3d 311, 326, 686 N.E.2d 245, 260-261; *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph six of the syllabus. In this case, error did occur in using the term "recommendation" in reference to a possible verdict of a life sentence, as a jury recommendation of a life sentence is binding on the trial court. But the error is harmless.

{¶ 73} Mason further argues that during the jury selection process, the trial judge unduly restricted voir dire, the prosecutor engaged in prosecutorial misconduct, and Mason's counsel failed to provide effective assistance. These claims lack merit.

{¶ 74} Mason first argues that the trial court unfairly restricted voir dire as to prospective jurors' views about race. As Mason points out, *Turner v. Murray* (1986), 476 U.S. 28, 36-37, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27, 37, held that a "capital defendant accused of an interracial crime is entitled to have prospective jurors * * * questioned on the issue of racial bias."

{¶ 75} Nonetheless, the *Turner* court also recognized that "the trial judge retains discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively. See *Ham v. South Carolina* [1973], 409 U.S. [524] at 527 [93 S.Ct. 848, 850-851, 35 L.Ed.2d 46, 50]." *Turner*, 476 U.S. at 37, 106 S.Ct. at 1689, 90 L.Ed.2d at 37. In Ohio, too, the scope of voir dire is within a trial court's discretion and varies with the circumstances. See *State v. Bedford* (1988), 39 Ohio St.3d 122, 129, 529 N.E.2d 913, 920; Crim.R. 24(A); R.C. 2945.27.

{¶ 76} In this case, the trial court allowed Mason an opportunity to discern racial bias as required by *Turner v. Murray*, *supra*. Before trial, each juror was asked to complete a forty-one-question form, specifically designed for this case, which asked questions as to their background, experiences, and attitudes.

{¶ 77} Moreover, during individual voir dire, the trial court allowed prospective jurors to be asked about racial prejudice or bias. Admittedly, the trial court wanted to defer extensive questioning about racial bias to general voir dire. But the trial court has discretion over whether to cover this subject in individual or general voir dire. *Turner*, 476 U.S. at 37, 106 S.Ct. at 1689, 90 L.Ed.2d at 37; *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph two of the syllabus.

{¶ 78} In fact, Mason's counsel asked jurors about their racial attitudes both during individual and general voir dire, which extended into three days. Thus, Mason was not denied an opportunity to question jurors on racial attitudes. See, also, *State v. Durr* (1991), 58 Ohio St.3d 86, 89, 568 N.E.2d 674, 678-679.

{¶ 79} Mason complains because, during individual voir dire of juror Crane, the trial judge said, "I agree with you there" after Crane remarked that "people are sentenced to death, and then they don't do anything about it anyhow, so it's not really a deterrent." Previously, the court, in referring to the crimes of child murder and rape, stated, "There are certain cases that—where the death penalty is proper and, of course, that would be one of them. And you're saying that you would apply that as one of them?" Mason contends that these remarks constituted inappropriate comment by the court as to its view of the death penalty.

{¶ 80} Although improper, the court's isolated remarks to single jurors were largely innocuous, and evoked no defense objection. The trial court instructed the jury to disregard any "indication of my view on the facts" and to disregard, in determining the penalty, any "indication of its view of the case." Unless it is proven otherwise, the jury is presumed to follow such instructions. See *State v. Henderson* (1988), 39 Ohio St.3d 24, 33, 528 N.E.2d 1237, 1246.

{¶ 81} Mason also claims that the prosecutor's reference to the "guilt phase" of the trial in individual voir dire of six prospective jurors created a "presumption of guilt." However, three of them did not sit as jurors. Moreover, the prosecutor explained to all that the first phase dealt with determining guilt or innocence. The first

phase of a bifurcated capital case may be referred to as the "guilt phase" as a convenient abbreviation, rather than using awkward terms such as the "guilt or innocence phase" or "determination of guilt or innocence" phase.

{¶ 82} Mason also claims his counsel was ineffective during jury selection. Yet reversal of a conviction or sentence based on ineffective assistance requires finding both (a) deficient performance, "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (b) prejudice, "errors * * * so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 83} Mason's complaints mostly amount to hindsight views about how current counsel might have voir dired the jury differently. However, we will not second-guess trial strategy decisions, and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. See, also, *State v. Davis* (1991), 62 Ohio St.3d 326, 349-350, 581 N.E.2d 1362, 1381.

{¶ 84} As to all of Mason's claims of ineffective assistance in regard to counsel's performance at voir dire, Mason fails to establish prejudice, namely, "that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶ 85} Mason argues that the prosecution improperly used peremptory challenges to exclude prospective jurors based on their opposition to the death penalty. But Mason waived the claim when he failed to ask for the state's explanation. See *State v. Lundgren* (1995), 73 Ohio St.3d 474, 485, 653 N.E.2d 304, 317. Moreover, apart from excluding jurors based on race or sex, "prosecutors can exercise a peremptory challenge for any reason, without inquiry, and without a court's control."

*State v. Seiber* (1990), 56 Ohio St.3d 4, 13, 564 N.E.2d 408, 419*; J.E.B. v. Alabama ex rel. T.B.* (1994), 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89. *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, does not extend to peremptory strikes against jurors opposed to the death penalty. *State v. Evans* (1992), 63 Ohio St.3d 231, 249, 586 N.E.2d 1042, 1057; *State v. Esparza*, 39 Ohio St.3d at 13-14, 529 N.E.2d at 198.

{¶ 86} Thus, Mason's contention that his conviction should be reversed based on error in voir dire is rejected.

V

Guilt-Phase Issues

{¶ 87} Gruesome Photos. Mason argues that the state's use of "cumulative, gruesome, [and] inflammatory color photographs" denied him a fair trial and due process. Under Evid.R. 403, the admission of photographs is left to a trial court's sound discretion. *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791. Relevant, nonrepetitive photographs are admissible in capital cases, even if gruesome, as long as the probative value of each photograph outweighs the danger of material prejudice. *Id*. at paragraph seven of the syllabus.

{¶ 88} Mason has failed to show that the trial court abused its discretion or that prejudicial impact of any of six crime-scene photos of the victim or three autopsy photos outweighed its individual probative value. These photographs were limited in number, and small (3-1/4 by 5 inches). They are not particularly gruesome or inflammatory. Two of the crime-scene photos were cumulative, but we find the error in admitting both to be harmless.

{¶ 89} The probative value of each photo is apparent. The prosecution's theory of the circumstances surrounding Robin's death was that a struggle of some type had taken place in the victim's car, after which the victim escaped and was chased into the abandoned building, where she was ultimately raped and murdered. The crime-scene photos of Robin's battered, bruised, and disrobed body, with her jeans

and panties pulled below her knees, tend both to prove that her death was committed in conjunction with a sexual offense and to rebut any inference that Robin engaged in consensual sexual activity. Other photos portray Robin's injuries and are relevant to proof of intent to kill. Finally, the photos are admissible, since they illustrate the testimony of the coroner and police. *Maurer*, 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus.

**{¶ 90}** The trial court did not commit prejudicial error in admitting the photographs as evidence.

**{¶ 91}** Improper Transcripts. Mason argues that the state's use of "transcripts with clear racially derogatory overtones" of his February 1993 police interviews in addition to the tapes denied him a fair trial. Mason contends that by accurately portraying Mason's use of ethnic language, the transcripts created "racially derogatory overtones" and were "inherently prejudicial."

**{¶ 92}** Yet Mason failed to object to use of the transcripts on this basis, although he had the transcripts and knew of their intended use. Had the issue been timely raised, revisions to the transcript might have been made. Mason waived this issue. Evid.R. 103(A)(1).

**{¶ 93}** Nor does plain error exist. Detective Potts testified that the transcripts were accurate, and counsel did not suggest otherwise. The jury knew about Mason's occasional use of ethnic English, since they had heard the tapes. "Where there are no 'material differences' between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error." *State v. Waddy* (1992), 63 Ohio St.3d 424, 445, 588 N.E.2d 819, 835.

**{¶ 94}** Further, the trial court did not abuse its discretion by allowing the transcripts in the jury room. The transcripts are useful and easier to understand than the tapes. See *United States v. Rengifo* (C.A.1, 1986), 789 F.2d 975. The court carefully instructed the jurors, "The transcripts are merely an aid to facilitate listening," and if they found any difference between the tape and transcript, "[Y]ou

should disregard the transcript and use your own judgment as to what was said * * *." Under the circumstances, no prejudicial error occurred. See *United States v. Costa* (C.A.11, 1982), 691 F.2d 1358, 1362; *United States v. Carson* (C.A.2, 1972), 464 F.2d 424, 436-437.

{¶ 95} <u>Exclusion of Evidence of Other Acts of Victim's Husband.</u> Mason contends that he was prevented from fully defending himself because the trial court refused to allow evidence of prior specific violent acts of Chris Dennis, Robin's husband. Mason contends that this exclusion hindered him in supporting his claim that Robin's murder had been committed by her husband. Mason argues that the trial court wrongfully excluded evidence that Chris Dennis (a) beat up a Chris Lyons and left him unconscious in a remote area in 1989, (b) attacked Ben Audin with a machete, and (c) struck his prior wife in the face.

{¶ 96} Yet evidence that Chris Dennis had allegedly committed specific acts of violence was not admissible. Subject to certain exceptions, Evid.R. 404(A) provides, "Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion * * *."

{¶ 97} None of the exceptions listed in Evid.R. 404(A) is applicable.

{¶ 98} Mason argues that the exceptions to Evid.R. 404(A) should be expanded because Chris Dennis was not on trial. According to Mason, Evid.R. 404 should not apply to witnesses or alternate suspects. But Evid.R. 404, by its terms, applies to all character evidence, not simply to persons accused of crimes.

{¶ 99} Mason was allowed to present some evidence that tended to show the criminal propensity of Chris Dennis. One witness testified that Chris had knocked Robin's head against the dashboard of her car at a New Year's Eve party, and a second testified that she had seen Chris bloody Robin's face before she got into the car at this party. The court allowed this defense evidence to explain blood later found in the car.

The first also commented on Chris's tendency for violence. The defense also questioned Chris about his heavy drinking and his fights with Robin.

{¶ 100} The court did not abuse its discretion in refusing to allow evidence as to other specific acts of Chris Dennis, nor were Mason's constitutional rights violated thereby. See, generally, Annotation, *Admissibility of Evidence of Commission of Similar Crime by One Other Than Accused* (1994), 22 A.L.R.5th 1; *Winfield v. United States* (D.C.App.1996), 676 A.2d 1; *United States v. McCourt* (C.A.9, 1991), 925 F.2d 1229, 1236, fn. 12.

{¶ 101} <u>Guilt phase instructions</u>. Mason argues that the trial court erred by "instructing the jury that it must first determine that Mason was not guilty * * * of aggravated murder" before considering whether he was guilty of murder. Yet Mason failed to object at trial and thus waived all but plain error. Crim.R. 30(A); *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶ 102} The trial court instructed the jury: "If you find the Defendant not guilty of Aggravated Murder, you will then continue with your deliberations and determine whether or not the State of Ohio proved beyond a reasonable doubt all the essential elements of the lesser crime of murder."

{¶ 103} We have held that instructions similar to those given here are not "acquittal first" instructions and did not constitute plain error. *State v. Allen* (1995), 73 Ohio St.3d 626, 638, 653 N.E.2d 675, 687; cf. *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph three of the syllabus. Moreover, since the jury found Mason guilty of raping Robin Dennis, it could not reasonably have found him not guilty of felony murder but guilty only of murder. The jury would have convicted Mason of aggravated murder rather than the lesser included offense of murder even if given the lesser included offense option. Cf. *Allen*, 73 Ohio St.3d at 637-638, 653 N.E.2d at 686-687. Hence, assuming *arguendo* that error was committed, that error was necessarily harmless.

{¶ 104} Thus, Mason's contention that his conviction should be reversed based on guilt-phase evidentiary rulings and instructions is rejected.

VI

Prosecutorial Misconduct

{¶ 105} Mason claims pervasive prosecutorial misconduct during both the guilt and penalty phases of the trial, focusing on the state's cross-examination of him and final guilt-phase and penalty-phase arguments.

{¶ 106} Determination of whether improper remarks constitute prejudicial prosecutorial misconduct requires analysis as to (1) whether the remarks were improper and, (2) if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885.

{¶ 107} During cross-examination of Mason, the state highlighted differences between his pretrial statements and his testimony. For example, in his pretrial statements, Mason claimed that he scarcely knew Robin and had never been alone with her. At trial, Mason asserted that she voluntarily had sex with him the morning of her death, thereby directly contradicting his pretrial statements. On cross-examination, over objection, the prosecutor asked Mason whether, consistent with his pretrial claims, he had his "attorneys do independent DNA testing to see if our [the state's] DNA results were right?"

{¶ 108} Under the circumstances, the state could remark on the differences between Mason's pretrial statement and his trial testimony and on the defense's decision to "switch strategies," and contrast his earlier denials and challenge to DNA testing with Mason's trial testimony that he had sex with Robin that day. By commenting on Mason's earlier lies to police, the prosecutor was not penalizing Mason for exercising his rights. See *State v. Landrum*, 53 Ohio St.3d at 110, 559 N.E.2d at 716-717.

**{¶ 109}** Admittedly, the state's remark in the final guilt-phase argument that Mason's counsel "tried to cloud the issues, tried to confuse" may have denigrated defense counsel. See *State v. Keenan* (1993), 66 Ohio St.3d 402, 406, 613 N.E.2d 203, 207. Yet counsel failed to object to any of the prosecutor's final guilt-phase argument. Thus, he waived all but plain error. *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus; Crim.R. 52(B). No plain error exists. Here, as in *Landrum*, when "viewed in its total context, the prosecutor's final argument was reasoned, logical, and not emotional." *State v. Landrum*, 53 Ohio St.3d at 111, 559 N.E.2d at 717.

**{¶ 110}** Additionally, the state could point out the weakness in defense claims that Mason and Robin were romantically involved. The state could also remark on the inconsistency between Mason's attack on eyewitness testimony and his own reliance upon doubtful eyewitness testimony. "Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence." *State v. Smith* (1997), 80 Ohio St.3d 89, 111, 684 N.E.2d 668, 689.

**{¶ 111}** The state did characterize Mason's testimony that police planted his keys in the victim's car as preposterous, but scene photos and the ensuing disassembly of the car proved that police never planted this evidence. "A prosecutor may state his opinion if it is based on the evidence presented at trial." *State v. Watson* (1991), 61 Ohio St.3d 1, 10, 572 N.E.2d 97, 106.

**{¶ 112}** The prosecutor did assert that the police "did an outstanding job" in their investigation, and thereby improperly vouched for the police. However, we do not find that prejudicial error resulted from the prosecutor's remarks, particularly in light of defense counsel's repeated criticism of the police investigation. Where a prosecutorial statement not supported by admitted evidence is "short, oblique, and justified as a reply to defense arguments and elicits no contemporaneous objection, there is no prejudicial error." *State v. Lott* (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293, 300.

**{¶ 113}** In view of the weight of evidence of Mason's guilt, none of the remarks Mason now complains about constituted plain error. Nor as to issues preserved, such as the cross-examination about DNA, were his rights materially prejudiced.

**{¶ 114}** Mason argues misconduct during the prosecution's closing penalty phase argument, but again his failure to object to remarks now complained about waives all but plain error. *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus; Crim.R. 52(B).

**{¶ 115}** No plain error or impropriety exists. The prosecutor's sentencing argument was restrained, noninflammatory, and based upon evidence before the court. Contrary to Mason's claims, the prosecutor correctly identified the aggravating circumstance and never attempted to make the murder an aggravating circumstance. "Moreover, the prosecutor could legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they were mitigating and to explain why the specified aggravating circumstance * * * outweighed mitigating factors." *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077.

**{¶ 116}** The prosecutor could properly minimize the importance of Mason's good conduct in jail, his artistic ability, and family opinions that Mason should avoid the death penalty, and comment upon the paucity of relevant mitigating evidence. "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson* (1996), 74 Ohio St.3d 381, 399, 659 N.E.2d 292, 309.

**{¶ 117}** Since Mason relied upon residual doubt, the prosecutor could comment that defense explanations seemed "far fetched." A prosecutor can respond to issues raised by an accused. *State v. Lundgren*, 73 Ohio St.3d at 491, 653 N.E.2d at 322. The prosecutor did not exceed limits by noting that Mason made an unsworn statement on which he could not be cross-examined. *State v. Gumm* (1995), 73 Ohio

St.3d 413, 653 N.E.2d 253, syllabus ("counsel for the state may comment upon the defendant's unsworn statement, if any").

## VII

### Sufficiency of Evidence

{¶ 118} Mason attacks the sufficiency of evidence to support his conviction for rape, aggravated murder during a rape, and the death-penalty specification that the murder occurred in the course of rape.

{¶ 119} In a review for sufficiency following a conviction, the evidence must be considered in a light most favorable to the prosecution. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 120} The evidence was such that the jury could reasonably find Mason guilty of rape, aggravated felony-murder based upon rape, and the death-penalty specification alleging rape. First, sexual penetration was clearly evidenced by the presence of Mason's semen in Robin's body. Thus, cases finding insufficient evidence of rape or attempted rape due to the lack of evidence of actual or attempted sexual penetration are inapposite. See, *e.g.*, *State v. Davis* (1996), 76 Ohio St.3d 107, 114, 666 N.E.2d 1099, 1107.

{¶ 121} Second, the element of force was supported by evidence of a struggle in Robin's car, and the fact that her jeans and panties were found pulled down below her knees. In addition, the evidence indicated use of force in that Robin had been both strangled and beaten. In other cases, similar evidence was sufficient to prove the element of force. See *State v. McGuire* (1997), 80 Ohio St.3d 390, 396, 686 N.E.2d 1112, 1118; *State v. Williams* (1996), 74 Ohio St.3d 569, 576, 660 N.E.2d 724, 732; *State v. Scudder* (1994), 71 Ohio St.3d 263, 274, 643 N.E.2d 524, 533.

{¶ 122} The jury had the right to believe the testimony of the state's witnesses and disbelieve Mason as to his activities on the date of Robin's disappearance. The record includes evidence that Robin and Mason left a private residence together in Robin's car in the early afternoon of February 8, 1993, that Robin's abandoned car was observed at approximately 4:30 that afternoon within walking distance of where her body was found, that a man matching Mason's description was seen in the same general area later that afternoon by two separate witnesses, and that Robin's husband Chris, who Mason contended was the murderer, was passed out drunk from early on the afternoon of February 8 until well after dark on that day. This evidence is sufficient to support the jury's conclusion that it was Mason who battered and killed Robin Dennis.

{¶ 123} Mason's argument that his conviction should be reversed based on insufficiency of the evidence is rejected.

VIII

Penalty-Phase Instructions

{¶ 124} Mason argues that the trial court repeatedly erred in instructing the jury.

{¶ 125} <u>Voir Dire Instructions</u>. Mason notes that in preliminary voir dire instructions, the trial judge stated that if Mason was found guilty, a second hearing would occur to consider sentence, but failed to tell the jury how it would determine whether to recommend death and implied that a finding of guilty on any charge could warrant the death penalty.

{¶ 126} Because Mason failed to contemporaneously object, error, if any, is waived, unless rising to the level of plain error. *State v. Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Despite Mason's complaint, the trial judge need not at that early stage completely instruct the jury, for example, by defining "aggravating circumstances" and "mitigating factors." The context of an instruction

must be considered. *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. We find no plain error.

{¶ 127} <u>Failure to Define Mitigating Factors</u>. The court instructed the jury to consider "mitigating factors including, but not limited to, the nature and circumstances of the offense and the history, character, and background of the Defendant, and any other factors that are relevant to the issue of whether the Defendant should be sentenced to death." Although the trial judge did not specifically define the term "mitigating factors," the instructions, considered as a whole, adequately guided the jury and did not restrict its consideration of mitigating evidence. See *State v. Wilson*, 74 Ohio St.3d at 397, 659 N.E.2d at 308; *State v. Murphy* (1992), 65 Ohio St.3d 554, 577, 605 N.E.2d 884, 903; *State v. Landrum*, 53 Ohio St.3d at 122, 559 N.E.2d at 727-728.

{¶ 128} <u>Guilt-phase Evidence</u>. The trial judge did not err in instructing the jury to consider testimony and exhibits "relevant to the aggravating circumstances and the mitigating factors which are admitted into evidence in the first phase of this case" in their penalty deliberations. The prosecutor at the penalty phase may introduce any evidence from the guilt phase relevant to the aggravating circumstances. *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph one of the syllabus. In *State v. Woodard* (1993), 68 Ohio St.3d 70, 78, 623 N.E.2d 75, 81, the court recognized that all exhibits from a trial's guilt phase "were relevant to the death penalty specifications * * * and to the nature and circumstances of the offense." Further, by relying upon residual doubt in arguing against the death penalty, Mason invited reconsideration of all guilt phase evidence.

{¶ 129} <u>Appeal</u>. The trial court instructed the jury, over objection, that Mason's "right to appeal his conviction will not be limited in any way by your imposition of the death sentence. Secondly, you should not consider the subject of appeal in determining sentence." Mason provoked this instruction when he declared, in his unsworn statement, "[A]ll I'm asking for is you guys to not sentence me to death

and give me one of the life sentences, so I will have a chance to bring this to Appeal Courts * * *. [G]ive me the chance to take it through the Appeals Courts * * *." The court's instruction was appropriate, accurately reflected the law, and did not diminish the jury's sense of its importance. Compare *State v. Phillips* (1995), 74 Ohio St.3d 72, 101, 656 N.E.2d 643, 669; *State v. Rogers* (1986), 28 Ohio St.3d 427, 28 OBR 480, 504 N.E.2d 52, paragraph one of the syllabus, reversed on other grounds (1987), 32 Ohio St.3d 70, 512 N.E.2d 581.

**{¶ 130}** Aggravating Circumstances. The trial court did err in referring to "aggravating circumstances," when only a single aggravating circumstance existed. Nonetheless, this slip of the tongue did not constitute plain error, particularly as the trial court identified for the jury a single aggravating circumstance of felony-murder.

**{¶ 131}** Mercy/Residual Doubt. Despite Mason's claims, the trial court need not instruct on mercy. *State v. Allen* (1995), 73 Ohio St.3d 626, 638, 653 N.E.2d 675, 687; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 417, 613 N.E.2d 212, 216. Nor need the court instruct on residual doubt. *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus.

**{¶ 132}** Mason's contention that his conviction should be reversed based on error in instructions to the jury is rejected.

IX

Juror Bias/Deadlock/Misconduct

**{¶ 133}** Juror Bias. Mason argues that he was denied a fair trial by an all-white jury because of racial prejudice.

**{¶ 134}** In a hearing on a new trial motion, an alternate juror testified that during the trial after two or three days, some jurors made remarks she considered racist. An impaneled juror testified to hearing "racist remarks [said in] a jive manner," but stated that it had no impact on her or other jurors.

**{¶ 135}** The overall record suggests that any such comments were isolated and did not demonstrate that the jury was racially prejudiced or that Mason was denied a

fair trial. Eleven jurors in affidavits all denied participating in or observing any racism. After considering the evidence, the trial judge concluded that "[a]t no time during the trial did any of the jurors participate in any acts of racism which could have impaired the Defendant's ability to receive a fair trial." No reason exists to disturb the trial court's finding.

{¶ 136} Jury Deadlock. Mason argues that if the jury reports a sentencing-phase deadlock, the court must then instruct the jury to consider only life sentences and cannot allow continued death-penalty deliberations.

{¶ 137} After approximately four and one-half hours of deliberations at the penalty phase, the jury sent out a note stating, "We are unable to reach a unanimous decision on any one of the sentencing options. Please advise * * *." Over defense objection, the trial judge then instructed the jury to continue deliberations but also instructed them, "If you decide that you cannot agree and that further deliberations will not serve a useful purpose, you may ask to be returned to the courtroom * * *." See *State v. Howard* (1989), 42 Ohio St.3d 18, 537 N.E.2d 188.

{¶ 138} The trial court then asked the foreman whether there was "a possibility * * * that after an additional period of time you may reach an agreement * * * [after] considering * * * the instructions?" The foreman answered "No," but he agreed to discuss with other jurors and "then return and respond to that question." At 5:00 p.m., the jury sent a note that they had made "some progress" and that it was "best to adjourn for the evening & resume fresh in the AM." After returning the next morning, the jury indicated after thirty minutes or so that they had reached a verdict.

{¶ 139} In *State v. Springer* (1992), 63 Ohio St.3d 167, 170, 586 N.E.2d 96, 99, the court recognized that Ohio's death-penalty statutes do "not contemplate the possibility of a hung jury in the penalty phase of a capital murder trial." Hence, "[w]hen a jury becomes irreconcilably deadlocked during its sentencing deliberations * * * the trial court is required" to impose an appropriate life sentence. *Id.* at syllabus. In view of *Springer*, Mason argues that the court erred by using a modified *Howard*

charge, and contends that the court "should have told them to consider the two life options or should have sentenced Mason itself."

**{¶ 140}** No exact line can be drawn as to how long a jury must deliberate in the penalty phase before a trial court should instruct the jury to limit itself to the life sentence options or take the case away from the jury, as done in *Springer*. Each case must be decided based upon the particular circumstances. Here, after only four and one-half hours of deliberations, the trial court acted appropriately by giving a modified *Howard* charge. The circumstances show that the jury was not irreconcilably deadlocked, and the modified *Howard* charge did not coerce a death verdict.

**{¶ 141}** Further, this court has approved using supplemental instructions urging jurors to continue deliberations to try to reach a unanimous penalty verdict. See, *e.g.*, *State v. Tyler* (1990), 50 Ohio St.3d 24, 26, 553 N.E.2d 576, 582-583. Such supplemental instructions to a jury considering the death penalty do not violate due process. *Lowenfield v. Phelps* (1988), 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568.

**{¶ 142}** <u>Jury Misconduct</u>. Mason argues jury misconduct and contends that the trial court's reliance on the *aliunde* rule, Evid.R. 606(B) (limiting evidence about jury's deliberation), denied him a fair trial. The *aliunde* principle protects the privacy of a jury's deliberations from inquiry and promotes the finality of jury verdicts. See *State v. Adams* (1943), 141 Ohio St. 423, 25 O.O. 570, 48 N.E.2d 861.

**{¶ 143}** After receiving evidence at a hearing held on a motion for new trial filed by Mason, the trial court found insufficient evidence that any juror "had failed to keep an open mind so as to be able to fairly decide * * * this case." The trial court further found that all jurors "were awake and attentive during all proceedings of the trial," and that the actions of one juror in "reporting * * * that she had disassembled her husband's revolver did not influence the verdict * * * [and Mason] was not prejudiced by this conduct." As to all of Mason's claims of misconduct, he has failed to establish any prejudice arising from the asserted misconduct. See Crim.R. 33(A);

*State v. Hipkins* (1982), 69 Ohio St.2d 80, 83, 23 O.O.3d 123, 125, 430 N.E.2d 943, 945-946.

{¶ 144} At the post-trial hearing, Mason also wanted to inquire into jury deliberations especially on the death penalty. Yet the trial court correctly ruled that Mason had presented no evidence of outside influences so as to avoid Evid.R. 606(B). No exception to the *aliunde* rule of evidence is appropriate simply for murder cases. Mason does not have a constitutional right to know the nature of jury discussions during deliberations. Thus, Mason's contentions lack merit and are rejected.

X

Ineffective Assistance of Counsel

{¶ 145} Guilt Phase. Mason complains that his counsel was ineffective in that he disclosed to the jury that Mason was on parole when arrested on February 12, and that his parole was thereafter revoked.

{¶ 146} Yet the disclosure may well have been made for tactical reasons. Mason's defense theory was that police rushed to judgment and did not adequately investigate Robin's murder because Mason was on parole. Moreover, the state would inevitably have proved Mason's felony convictions to impeach his credibility as a witness. Evid.R. 609. Further, the state could prove both convictions, since Mason was charged with having a weapon under disability. R.C. 2923.13(A)(2) and (3). Mason simply took the sting out of the evidence by early disclosure. *State v. Tyler*, 50 Ohio St.3d at 34, 553 N.E.2d at 590.

{¶ 147} As to other aspects of his counsel's guilt-phase performance, no ineffectiveness has been demonstrated, and Mason's complaints lack merit. Trial counsel presented a strong, vigorous, thorough, and aggressive defense before and during the trial. Counsel also developed a "coherent and consistent defense theory" that Mason was innocent and Chris Dennis was guilty. See *State v. Ballew* (1996), 76 Ohio St.3d 244, 256, 667 N.E.2d 369, 381. Mason's conviction demonstrates that the jury simply accepted the state's interpretation of the evidence, and rejected the theory

presented by the defense. Counsel's performance did not fall "below an objective standard of reasonable representation." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. We have reviewed each of a number of instances Mason claims illustrate ineffective assistance of counsel and find nothing reflecting "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

{¶ 148} Nor has Mason brought forth any conduct on the part of his counsel demonstrating prejudice, "that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶ 149} <u>Penalty Phase</u>. Mason argues that his counsel failed to investigate and present a life history of Mason and his psychological background so that he would not receive the death penalty. Mason also complains about the paucity of mitigation evidence presented in defense.

{¶ 150} The record, however, suggests that defense counsel had voluminous records about his history and background. Counsel prepared twelve exhibits documenting aspects of Mason's childhood, such as reports that he was beaten by his father and released by his parents to juvenile authorities, as well as early psychological evaluations, but did not present them to the jury. Mason argues that these exhibits show that a cogent, persuasive mitigation case could have been built revealing Mason's childhood exposure to violence, his dysfunctional family, and his early emotional and psychological problems.

{¶ 151} But the records also show prior involvements with the criminal and juvenile justice systems, and other unfavorable matters. Mason could not have presented evidence as to his good character and rehabilitation potential without risking the introduction of negative evidence by the state in rebuttal.

{¶ 152} Similarly it was not an unreasonable strategic decision to refrain from presenting the video deposition of psychiatrist Dr. Spare in order to avoid rebuttal by evidence of Mason's behavioral problems, character deficiencies, and poor potential for rehabilitation. We will not second-guess the strategic decisions counsel made at trial even though appellate counsel now argue that they would have defended differently. *State v. Post* (1987), 32 Ohio St.3d 380, 388, 513 N.E.2d 754, 762.

{¶ 153} Nor has Mason shown prejudice, the second *Strickland* requirement, namely "a reasonable probability" that different tactical choices at the penalty phase would have made a difference in the result. See *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

## XI

## Constitutionality

{¶ 154} Mason's attack on the constitutionality of Ohio's death-penalty statute is summarily rejected. *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

## XII

## Independent Sentence Evaluation

{¶ 155} <u>Sentencing Evidence</u>. Mason's mother, older brother, who was a prison guard, and his older sister all testified on Mason's behalf and pleaded with the jury not to impose the death penalty. His mother said he was a good son, and she loved him deeply. His sister also loved him very much and thought Mason was not a bad person.

{¶ 156} A cousin testified that she believed that the state's correctional system had failed Mason and that he deserved another chance to be rehabilitated. Two deputy sheriffs testified that while Mason had been in jail for over a year, he had not been a problem as an inmate even on escorted trips.

{¶ 157} His wife, Terry Mason, pleaded with the jury "not to kill" Mason. She testified that Mason was her reason for living and without him she could not go on.

On cross-examination, Terry agreed that Mason was not at home when she arrived there around 4:15 p.m. on February 8, 1993. Mason came home around 5:30 p.m., then left, and did not return until later that night. Mason had done some drawings that his wife and others thought showed great artistic promise.

{¶ 158} In an unsworn statement, Mason begged for his life on the basis that he had not killed Robin. He wanted a life sentence so he would "have a chance to bring this to Appeal Courts, * * * [which would] weigh the evidence all over again, and see that I didn't have nothing to do with that girl's death." Further, Mason said, "I know, God knows, and everybody who knows me knows, I don't have to answer to you guys no more. I already answered to him."

{¶ 159} <u>Sentence Evaluation</u>. After independent assessment, we find that the evidence is sufficient to prove the aggravating circumstance of felony-murder.

{¶ 160} As to possible mitigating factors, nothing in the nature and circumstances of the offense appears mitigating.

{¶ 161} Mason's history and background provide a few mitigating features. His wife, mother, and other family members love him and do not want him executed. Also, he may have artistic talent.

{¶ 162} At trial, Mason relied upon residual doubt. In the syllabus to *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112, however, this court held that residual doubt can no longer be deemed a mitigating factor.

{¶ 163} Mason's adjustment to jail is a mitigating factor, but no other features of this case appear as mitigating "other factors" under R.C. 2929.04(B)(7).

{¶ 164} The aggravating circumstance outweighs the extremely modest mitigating factors presented. Mason was convicted of raping Robin Dennis, strangling her, and beating her to death. Even when considered collectively, the mitigating factors are not of great weight. Thus, the specified aggravating circumstance outweighs the mitigation beyond a reasonable doubt, and the death penalty is appropriate.

{¶ 165} We find that that death sentence in the case at bar is proportionate to penalties in other cases we have reviewed. See, *e.g.*, *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (mitigation evidence of turbulent childhood); *State v. Phillips*, 74 Ohio St.3d at 104-106, 656 N.E.2d at 671-672 (nineteen year old, no significant criminal record, hard worker, low intelligence, deprived childhood); *State v. Gumm*, 73 Ohio St.3d at 432, 653 N.E.2d at 270 (deprived childhood, retardation, no criminal history).

{¶ 166} Imposing the death penalty in this case is neither excessive nor disproportionate when compared with similar felony-murder cases. See *McGuire, Phillips*, *Gumm, supra; State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674; *State v. Henderson*, 39 Ohio St.3d 24, 528 N.E.2d 1237; *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394; *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383.

{¶ 167} Accordingly, Mason's convictions and death sentence are affirmed.

*Judgment affirmed*.

DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

———————————