DECISION.
This is a death-penalty appeal. Though these cases now ordinarily bypass this court, the murders here occurred well before that change in the law. We affirm the convictions and the death sentences.
A Hamilton County jury found appellant Gary Hughbanks guilty of the aggravated murders of William and Juanita Leeman, as well as the aggravated burglary of their home. Following the penalty phase of Hughbanks's trial, the jury recommended that the death penalty be imposed for the murders. The trial court sentenced Hughbanks to death for the murders and imposed a term of incarceration for the aggravated burglary.
I. Hughbanks's Appeal
Hughbanks raises fifteen assignments of error. In his first assignment, he contends that the trial court was required to grant the funds necessary to present his defense. In his second assignment, Hughbanks argues that this conviction was based on insufficient evidence. In his third and fourth assignments, Hughbanks claims that the trial court erred in failing to appoint for his assistance an independent pathologist and a neuropharmacologist. In his fifth assignment, Hughbanks asserts that the denial of a reasonable bond before trial unconstitutionally infringed on his right to assist counsel in the preparation for both phases of his trial. In Hughbanks's sixth assignment, he contends that the trial court erred in admitting gruesome and cumulative photographs of the victims.
In Hughbanks's seventh assignment, he asserts that it is unconstitutional to require that mitigating circumstances be proved by a preponderance of the evidence. Hughbanks argues in his eighth assignment that the trial court erred by instructing the jury on the statutory definition of "reasonable doubt" during the mitigation phase of his trial. He next argues that Ohio's death-penalty statutes are unconstitutional.
In his tenth assignment, Hughbanks claims that the trial court erred in overruling his motion to suppress. In his eleventh assignment, he claims that trial counsel was ineffective for failing to provide expert psychiatric testimony to support his suppression motion. He claims ineffective counsel in his twelfth assignment, as well, based upon counsel agreeing to allow the state to forego producing as witnesses the family members who implicated Hughbanks in the murders. In his thirteenth assignment, Hughbanks claimed he was denied a fair trial based on the admission of "other acts" testimony. Hughbanks contends in his fourteenth assignment that the trial court erred by allowing the state to question Hughbanks's psychiatrist on the legal definition of insanity during the mitigation phase of his trial, when he had not pleaded insanity as a defense. In his last assignment, Hughbanks argues that it was constitutionally impermissible for the trial court to instruct the jury that a death-sentence verdict was merely a recommendation.
II. The Murders
On May 13, 1987, William Leeman encountered an intruder in the master bedroom of his home on Adams Street in Springfield Township. During a struggle, the intruder stabbed Mr. Leeman multiple times. The knife had a blade approximately four inches long and one and one-half to two inches wide. The intruder finished his attack by slitting Mr. Leeman's throat. The intruder then attacked Mrs. Leeman outside the bedroom and slit her throat. The bloodstains found at the scene indicated that Mrs. Leeman crawled out the front door of the house, across the patio, and down the driveway to the street. At approximately 9:25 p.m., Springfield Township Police Officer Pat Kemper, while returning from an attempted-suicide call in the neighborhood, noticed Mrs. Leeman lying on the driveway and stopped to investigate. (Kemper had passed the Leemans at approximately 9:00 p.m. in response to the attempted-suicide call, but had not noticed anything unusual.) Mrs. Leeman was conscious but, due to her wounds, she was unable to speak. Kemper called for medical assistance and police backup. Mrs. Leeman died after reaching the hospital.
Kemper and another officer followed the bloody trail back to the house. He and the officer entered the house and found Mr. Leeman's body on the floor in the bedroom. It appeared that a scuffle had occurred in the bedroom. Also, some of the drawers of the dresser were open and the telephone wire had been cut.
The officers noted large amounts of blood in the master bedroom and the living room, a blood smear on a light switch in the back bedroom, and blood on the back screen door by the door handle. The officers found a bloody hand towel in the bathroom sink. A police bloodhound followed the intruder's trail from the hallway of the house, out the back door, to a creek bordering the Leemans' backyard, then left to a school, and back to Adams Street before it lost the scent.
III. Focusing the Investigation on Hughbanks
Ten years later, Kemper received a call from Hughbanks's brother, Larry. Larry informed Kemper that Hughbanks was in Arizona, but that before Hughbanks had left, he told Larry that he had killed the Leemans and had thrown the knife in some woods. Kemper contacted the prosecutor's office, and a meeting was convened. During that meeting, Hughbanks's father, Garry, arrived at the police station to confer about his son's involvement in the murders.
Subsequently, John Jay, an investigator for the Hamilton County Prosecutor's Office, and an assistant prosecutor interviewed Garry and Larry. Larry provided a survival knife to the investigator and identified it as the knife that Hughbanks had thrown into a wooded area in the early part of 1988. According to the investigator, Hughbanks's father also "implicated" Hughbanks in the Leeman murders. Jay also interviewed Hughbanks's uncle and cousin, who identified Hughbanks as the Leemans' killer. Hughbank's ex-common-law wife provided another knife similar to the one recovered from Larry, which she identified as belonging to Hughbanks. Hughbanks was charged with the Leeman murders.
Following a meeting in Arizona between the Ohio authorities and Tuscon, Arizona, police officers, the Arizona police officers brought in Hughbanks for questioning by the Ohio authorities. During the interview, Hughbanks denied involvement in the murders. He was held in custody, pending extradition to Ohio. One week later, upon a request from the Ohio authorities, two Arizona officers again interrogated Hughbanks. He confessed then to the murders.
The confession began with Hughbanks stating that he did not remember having any involvement in the murders. After further questioning, however, he admitted to being present with others, but accused someone else of killing the Leemans. After the interrogating officers stated that they knew he had killed the Leemans, provided details of the crime, and suggested that he had attacked the Leemans in self-defense, Hughbanks confessed that he had committed the murders.
IV. Suppression Hearing
Hughbanks moved to suppress the confession he made to the Arizona police. At the hearing, the state presented the taped confession, the testimony of William Fletcher, an investigator for the Hamilton County Prosecutor's Office, and Arizona police officers Michael Millstone and James Filippelli. Hughbanks was interrogated twice while he was in Arizona. The first interrogation took place on September 9, 1997. First, Fletcher questioned Hughbanks. Officer Millstone then administered a polygraph examination. Fletcher provided Hughbanks with hisMiranda rights prior to questioning him, and Hughbanks signed a waiver-of-rights form. Fletcher questioned Hughbanks for several hours. During that time, he showed Hughbanks a photograph of the outside of the Leemans' house and a photograph depicting Mrs. Leeman's wounds. He testified that Hughbanks denied he was under the influence of any drugs or medication and that he did not behave as if he were. Fletcher later learned that Hughbanks had injected crystal methamphetamine earlier that morning. He testified, however, that Hughbanks did not act abnormally.
During the interview, Hughbanks informed Fletcher that he intermittently had been treated by Dr. DeSilva, a psychiatrist. Fletcher could not recall Hughbanks telling him that DeSilva had prescribed any medication for mental illness. Subsequently, Fletcher contacted Dr. DeSilva, but could not determine when Hughbanks started treatment or whether he had been prescribed any type of psychotropic medications.
Millstone testified that, before he administered the polygraph test, he advised Hughbanks of his Miranda rights. Because of the abnormal test results, Millstone asked Hughbanks whether he had used any drugs that day. Hughbanks showed him where he had injected crystal methamphetamine into his arm that morning. Millstone testified that the results of the test were "not inconsistent" with someone "coming down" from a drug-induced "high."
Approximately one week later, Millstone and Filippelli visited Hughbanks to determine whether he wanted to take another polygraph test. Millstone testified that Hughbanks insisted on taking the test. Hughbanks signed a form stating that he was voluntarily submitting to the polygraph test and that he had been advised of his Miranda rights. Filippelli administered the test that day. Millstone testified that Hughbanks did not appear to be under the influence of drugs, that he indicated that he was not under the influence of drugs, and that he appeared to understand his rights and respond appropriately. Millstone testified that the first time Hughbanks indicated that he wanted an attorney was after he had spoken to his mother on the telephone. The telephone call occurred after he had confessed. Millstone testified that he made no attempt to talk with Hughbanks's psychiatrist and did not know how Hughbanks's mental illness might have affected his perception of his rights. He testified that he did suggest to Hughbanks that Hughbanks had probably committed the crimes. He described Hughbanks as "functioning just fine."
Filippelli testified that Hughbanks wanted to take the second polygraph test. He read the polygraph consent form to Hughbanks and asked him if he understood each part of the form and the rights contained in each part. Filippelli testified that Hughbanks gave no verbal or physical indication that he did not understand what was happening. Filippelli stated that he used the polygraph test results in his later questioning of Hughbanks. Filippelli corroborated Millstone's testimony that it was during the telephone call with his mother that Hughbanks first requested an attorney.
Filippelli testified that he learned of Hughbanks's involuntary hospitalizations, that Hughbanks had been prescribed Lithium, Zoloft, and Trazodone in the past, and that he had not taken the medications for quite some time. Filippelli testified that it was possible that a medication prescribed to avoid hallucinations would have some effect on a person's ability to remember what had occurred ten years earlier. Filippelli also testified that he made no effort to contact a psychiatrist or a psychologist to examine Hughbanks.
V. Trial Proceedings
At the guilt phase of the trial, the defense called no witnesses and allowed Kemper and Jay to testify that Hughbanks's family members had implicated him in the murders.
In the penalty phase, the defense presented the videotaped depositions of two psychiatrists who had treated Hughbanks at various times in his life, his uncle's deposition, testimony by his sister and mother, and Hughbanks's unsworn statement.
Hughbanks's uncle testified about mental illness in the family. The uncle had been diagnosed as a paranoid schizophrenic. He testified that Hughbanks's father was abusive to his wife and had extramarital affairs, leaving his family to fend for itself at times. He stated that Hughbanks's father also failed to provide financially for his family.
Hughbanks's younger sister testified that Hughbanks's father had "mental problems" and would become very angry and isolate himself in his room for days at a time. He was violent towards his wife. Hughbanks's father would tell his wife that she was a bitch and was "no good" whenever he was involved with a new woman. When Hughbanks's father was in a bad mood, the children had to sit in their rooms and were forced to go to bed at 5:30 p.m. Hughbanks's mother would discipline the children with a belt when they misbehaved.
Hughbanks's sister testified that she saw a black shadow with red eyes in her home and tried to avoid it. She stated that Hughbanks also saw a black shadow with red eyes and was afraid of it. She testified that Hughbanks had made several suicide attempts, and that when Hughbanks was not taking Lithium, he was depressing to be around and had more of a temper. She also testified that he abused alcohol and street drugs.
Hughbanks's mother testified that Hughbanks was born with an open stomach that had to be corrected surgically. She stated that her husband was abusive and that his behavior kept the family isolated. She divorced him at one time, but became re-involved with him upon his promise to seek psychiatric treatment. He was verbally abusive to the children, attempted suicide at least three times, and was hospitalized several times. Hughbanks's mother testified that she physically disciplined the children and that, at times, she was "too rough." She testified the Hughbanks attempted suicide on several occasions. She denied that Hughbanks had ever hit her, but admitted that he had abused his three girlfriends.
Dr. Raju testified that he admitted Hughbanks for treatment at Christ Hospital for two weeks in June of 1986, because of agitation and psychotic behavior. Hughbanks had complained of hearing voices telling him to kill himself, as well as having homicidal thoughts. He was prescribed antipsychotic medication. Hughbanks was admitted again in August of that year for three days as a result of a drug overdose. The psychiatrist diagnosed Hughbanks as having a major affective disorder, bipolar disorder, and drug and alcohol abuse. He explained that a manic-depressive person such as Hughbanks has poor judgment and little insight into his behavior.
Dr. Bernard DeSilva testified that he had treated Hughbanks intermittently from the time Hughbanks was fifteen. His last contact with Hughbanks was in 1996 or 1997. His initial contact with the family began with his treatment of Hughbanks's father for paranoid schizophrenia with some schizoaffective features. He diagnosed Hughbanks as having a schizoaffective disorder and a bipolar disorder of manic depression, with intermittent drug and alcohol abuse. Most of Hughbanks's psychiatric interventions and hospitalizations were because of suicidal intent. Dr. DeSilva prescribed Lithium, Chloroform, or Thorazine at various times, but determined that consistency in taking the medication was impaired because of Hughbanks's disorganized support system.
He described Hughbanks as impulsive and stated that he had hallucinations, including one similar to that of his father's hallucination-a red-eyed devil. Dr. DeSilva testified that Hughbanks's delusions and hallucinations were not a function of his substance abuse. He testified that Hughbanks was afraid that he would hurt people when he was angry. He agreed that, untreated, Hughbanks would be subject to dangerous rages.
The state moved to have the testimony and exhibits from the guilt phase of the trial admitted in the sentencing phase. The trial court granted the motion over objections. The state presented psychologist Dr. Schmidtgoessling's testimony, as well. She testified that there was nothing to indicate whether, if Hughbanks's previous diagnostic labels were correct, those disorders caused him to commit the murders. She diagnosed Hughbanks as having "some sort of mood disorder, a possible substance abuse and dependence, and a character disorder." She also testified that Hughbanks told her that on the night of the murders he was stable, and not high, drunk, or hallucinating.
VI. Failure to Provide Funds
In his first assignment, Hughbanks claims that the trial court failed to provide the funds necessary to present his defense, in violation of his equal-protection rights. Specifically he claims that he should have been provided funds for a substance-abuse expert, a coroner, and a crime-scene investigator. In his third and fourth assignments, Hughbanks argues that the trial court's failure to provide him with an independent pathologist and a neuropharmacologist denied him due process, equal protection, effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and statutory rights. None of these assignments has merit.
The Ohio Supreme Court has recognized that "[t]he Due Process and Equal Protection Clauses of the Fourteenth Amendment clearly protect indigents prosecuted under state criminal justice systems."[1] The trial court is authorized to grant indigent defendants funds for investigation services and experts in aggravated-murder cases under R.C. 2929.024, when that is "reasonably necessary for proper representation." The trial court has discretion in ordering such funds based upon "the value of the expert assistance to the defendant's proper representation" and "the availability of alternative devices" that could fulfill the same functions.[2] Due process requires that funds be provided where the defendant has made "a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial."[3] It is insufficient to show a "mere possibility" of assistance.[4]
The record demonstrates that Hughbanks made no request for funds to obtain the experts whose services were not provided to him. (He did, however, request and was granted funds to obtain a mitigation specialist and a neuropsychologist.) Therefore, Hughbanks has failed to preserve the issue of funding for experts for appeal and has failed to make the particularized showings required by State v. Mason.[5] Thus, we overrule Hughbanks's first, third and fourth assignments.
VII. Sufficiency and Weight of the Evidence
In his next assignment, Hughbanks challenges both the sufficiency and the weight of the evidence supporting his conviction. In reviewing Hughbanks's sufficiency-of-the-evidence claim, we examine the evidence presented at trial to determine whether that evidence, viewed in a light most favorable to the state, could have convinced a rational trier of fact that Hughbanks was guilty beyond a reasonable doubt.[6] In reviewing his weight-of-the-evidence claim, we must weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.[7]
The state had the burden of proving that Hughbanks purposefully caused the deaths of Mr. and Mrs. Leeman while committing or attempting to commit aggravated burglary. The state also had to prove the three death-penalty specifications attached to each aggravated-murder charge. These required proof that (1) Hughbanks committed the murders in order to escape detection, apprehension, trial, or punishment for the aggravated burglary; (2) the killings were part of a course of conduct involving the purposeful killing of two or more people; and (3) the murders were committed by Hughbanks as the principal offender while he was also committing or attempting to commit, or fleeing after committing or attempting to commit, the aggravated burglary. To demonstrate aggravated burglary, the state had to prove that Hughbanks trespassed in the Leemans' home by force, stealth, or deception, with the purpose to commit a theft offense or felony, and that he inflicted physical harm on the Leemans.
The following evidence was presented at trial through the testimony of the coroner, the Leemans' son, an investigator for the Hamilton County Prosecutor's Office, and Hughbanks's confession. Hughbanks entered the Leemans' home by cutting a window screen. He cut the telephone cord and searched the dresser and closet of the master bedroom, looking for valuables or money. He was surprised in the act by Mr. Leeman. He attempted to crawl out the window, but Mr. Leeman pulled him back into the room. He and Mr. Leeman struggled, and he stabbed or slashed Mr. Leeman seventeen times with a knife, while Mr. Leeman tried to protect himself. After Mr. Leeman was on the floor, Hughbanks severed Mr. Leeman's carotid artery. He then attacked and stabbed Mrs. Leeman to prevent her from later identifying him. Some jewelry and Mr. Leeman's wallet were later discovered missing.
We believe that the evidence was sufficient to support the aggravated-murder charges, the death specifications, and the aggravated-burglary charge, when viewed in a light most favorable to the state. Moreover, although there were conflicts in the evidence, e.g., the color of the carpet as described in the confession and as demonstrated by the photographs; the color of the bed's headboard as described in the confession and as depicted in the photographs; Mr. Leeman's clothing as described in the confession and as depicted in the photographs, and the location where Mr. Leeman fell in the bedroom, as described in the confession and as depicted in the photographs, we cannot conclude that, in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.
VIII. Denial of Bail
In his fifth assignment, Hughbanks claims that the trial court's failure to set a bond infringed on his right to assist his counsel. Hughbanks's bail hearing took place in September of 1997. Thus, we rely on the versions of Crim.R. 46 and Section 9, Article I, Ohio Constitution, in effect at that time. Section 9, Article I of the Ohio Constitution allows for bail in capital cases except "where the proof is evident, or the presumption great." Crim.R. 46(A) incorporates this same language. The trial court is granted the discretion to make that determination.[8] An indictment charging a capital offense may raise a presumption sufficient to justify the refusal of bail.[9]
In this case, the trial court, after reviewing the allegations, Hughbanks's criminal record, and his ability to leave the jurisdiction, granted the state's request to deny bond. We do not find fault with this decision. Further, we find no merit in Hughbanks's assertion that the denial of bail, in and of itself, denied him the opportunity to assist his trial counsel in preparing his defense.
IX. Gruesome Photographs
Hughbanks argues in his sixth assignment that photographs of the Leemans were so gruesome and cumulative that their admission into evidence was prejudicial. He does not, however, specify the particular photographs that should have been excluded. The trial court admitted into evidence two photographs of Mr. Leeman in the bedroom, twelve autopsy slides depicting Mr. Leeman's wounds, and eleven autopsy slides depicting Mrs. Leeman's wounds. Hughbanks objected to three slides depicting Mr. Leeman's wounds, three slides depicting Mrs. Leeman's wounds, and one of the two photographs of Mr. Leeman. It is those slides and photographs that we address.
The slides of Mr. Leeman were used by the coroner to (1) describe the type of weapon used, (2) explain that a struggle had ensued, and (3) indicate the cause of death. The slides of Mrs. Leeman were used to (1) describe the knife used, (2) explain that Mrs. Leeman had fallen or been struck by something hard, and (3) describe how her throat had been cut in a way that prevented her from screaming or talking. Further, the slides were probative of the fact that the murders were done purposely. The two photographs of Mr. Leeman were used by the officer who found the body to describe the scene.
The Ohio Supreme Court has held that even gruesome photographs, if properly authenticated, are admissible if they are relevant and of probative value, or are illustrative of testimony, as long as their probative value outweighs the danger of material prejudice and they are not unnecessarily repetitive or cumulative.[10] But certainly the number of photographs and the lack of relevance to material issues may require the exclusion of some photographs. Having reviewed the evidence admitted in this case under the standard set forth in State v. Maurer, we conclude that the trial court did not abuse its discretion in admitting the slides and photographs.
X. Constitutionality of Ohio's Capital Sentencing Scheme
In his seventh, eight, ninth, and fifteenth assignments, Hughbanks challenges the constitutionality of Ohio's capital sentencing scheme. As it is proper for us to do, we choose to summarily dispose of the issues he raises because the Ohio Supreme Court has previously considered and decided each one.[11]
In his seventh assignment, Hughbanks argues that it is unconstitutional to require capital defendants to prove the existence of a mitigating factor by a preponderance of the evidence. The Ohio Supreme Court has considered and rejected Hughbanks's argument.[12]
In his eighth assignment, Hughbanks contends that the definition of reasonable doubt found in R.C. 2901.05(D) is inadequate and, thus, constitutionally defective. This argument was addressed inState v. Jenkins, supra.
Hughbanks raises a number of arguments in his ninth assignment. He first asserts that Ohio's capital sentencing scheme allows the death penalty to be applied in an arbitrary and discriminatory manner because of the unfettered discretion prosecutors have in determining whom to indict, and because the scheme is racially biased. This argument has been rejected byState v. Jenkins, supra.
He next argues that the death-penalty statutory scheme is flawed because it fails to (1) require the state to prove the absence of mitigating factors, (2) require the state to prove that death is the only appropriate penalty, and (3) ensure a proper weighing of aggravating circumstances versus mitigating factors. These arguments have been considered and rejected by the Ohio Supreme Court.[13]
Hughbanks also argues that the Ohio death-penalty statutes are unconstitutional because proof of aggravating circumstances in the guilt phase of the bifurcated trial "prohibits a sufficiently individualized determination in sentencing." This argument was rejected by the Ohio Supreme Court in State v. D'Ambrosio.[14]
According to Hughbanks, Ohio's capital-punishment scheme imposes an impermissible risk of death on a defendant who chooses a jury trial because there is no provision allowing for dismissal of death-penalty specifications with a jury trial. This argument has been rejected by State v. Buell.[15]
Hughbanks next argues that the death-penalty statutes are unconstitutional because they require the submission of the presentence-investigation report and mental evaluation to the jury or judge once they are requested by the defendant. This argument was considered and rejected in State v. Buell, supra.
In his next argument, Hughbanks contends that the definition of mitigating factors in R.C. 2929.04(B) (7) violates the reliability component of the Eighth Amendment. He claims that the language requiring consideration of any other factors relevant to whether a defendant should be sentenced to death permits the sentencer to convert a mitigating factor into a reason for imposing a death sentence. This claim of constitutional vagueness has no merit. First, the Ohio Supreme Court has upheld R.C. 2929.04(B) (1) through (7) against challenges of constitutional vagueness.[16]
Second, we see no merit in Hughbanks's specific challenge. The provision is clearly placed as one of a series of mitigating factors. Further, the trial court instructed the jury in Hughbanks's case that it was to consider "[a]ny other factors that call for a penalty less than death, or lessen the appropriateness of the death penalty." There is no merit in this argument.
Hughbanks next contends that Ohio's capital sentencing scheme is unconstitutional because R.C. 2903.01(B) and the aggravating circumstance found in R.C. 2929.04(A) (7) are duplicative. The issues Hughbanks raises under this argument have been considered and rejected by State v. Henderson,[17] State v.Lewis,[18] and State v. Jenkins, supra.
He further argues that R.C. 2929.03(D) (1), which allows consideration of the "nature and circumstances of the aggravating circumstance the offender was found guilty of committing" in deciding whether to impose the death penalty, and R.C. 2929.04, which classifies the "nature and circumstances of the offense" as a mitigating factor, are unconstitutionally vague because they allow consideration of "nature and circumstances" evidence as both an aggravating circumstance and a mitigating factor. The Ohio Supreme Court rejected this argument in State v.McNeill.[19]
Hughbanks next challenges the proportionality and appropriateness review of the capital sentencing scheme. He contends that proportionality review cannot be based on a comparison of similar cases where the statute fails to require that the jury or panel recommending a life sentence identify the mitigating factors. He also argues that reviewing only cases where the death penalty is imposed is constitutionally flawed. He next alleges that reviewing courts only provide a cursory review when determining the appropriateness of the death penalty, and that this violates his due-process rights. Hughbanks provides no support for this last allegation. The remaining arguments have been rejected by the Ohio Supreme Court in State v. Jenkins,supra, and State v. Steffen.[20]
Hughbanks claims that the electric chair constitutes cruel and unusual punishment. The Ohio Supreme Court has decided otherwise.[21]
Hughbanks's next argument states that Ohio's death-penalty scheme fails to comply with the Organization of American States Treaty. The Ohio Supreme Court rejected this argument in State v. Phillips[22] State v. Bey.[23]
In his fifteenth assignment, Hughbanks asserts that it was constitutionally impermissible to instruct the jury that its death verdict would be only a recommendation. During voir dire, the trial court informed the prospective jurors that although the word "recommendation" would be used regarding the sentence the jury chose, the recommendation would be the sentence. It instructed the jury that, following the mitigation phase, it had to make a recommendation on the sentences to be imposed for the murders and that the state sought a death recommendation. It also instructed the jury that during its deliberations it would decide which sentence to impose. We find no constitutional violation resulting from the trial court's instructions.[24] We overrule Hughbanks's seventh, eighth, ninth, and fifteenth assignments.
XI. The Confession
In his tenth assignment, Hughbanks challenges the denial of his motion to suppress his confession. In his motion, Hughbanks argued that he was under the influence of drugs when he signed a waiver of Miranda rights on September 9, 1997. He also claimed that he was mentally ill on that date and on September 16, 1997, when he provided his confession. The trial court, upon reviewing the testimony and Hughbanks's taped statements, denied the motion.
Hughbanks sought to suppress his confession on two grounds: (1) that he did not voluntarily waive his Fifth Amendment rights to counsel and against self-incrimination, and (2) that his confession was involuntary under the Due Process Clause. These are distinct issues, but both are "both measured by the `totality of the circumstances' standard."[25] The Ohio Supreme Court has explained:
[I]n deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.[26]
The state has the burden of proving that a suspect knowingly, intelligently, and voluntarily waived his Miranda
rights by a preponderance of the evidence.[27] The state must prove that "(1) the accused was given the Miranda warnings prior to any interrogation; (2) after receipt of the warnings, the accused made an express statement that he desired to waive his constitutional rights; and (3) the accused made a voluntary, knowing, and intelligent waiver of those rights."[28]
At issue in this case is whether Hughbanks's waiver was voluntary. "The inquiry whether a waiver has been coerced has two distinct dimensions. First, the relinquishment of the right must have been voluntary `in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.' Second, the suspect must have made the waiver `with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"[29] Absent evidence that an accused's will was overborne or that his capacity for self-determination was critically impaired by coercive police conduct, his decision to waive his Fifth Amendment privileges is deemed voluntary.[30]
The state also bears the burden of proving by a preponderance of the evidence that a confession is involuntary within the meaning of the Due Process Clause.[31] "[C]oercive police activity is a necessary predicate to the finding that a confession is not `voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."[32] The trial court is the arbiter of questions of fact and the credibility of witnesses in deciding the voluntariness issues at a suppression hearing.[33]
Hughbanks claims that his mental illness and drug ingestion rendered him unable to waive voluntarily his Fifth Amendment rights and that his mental illness negated his ability to voluntarily confess. Hughbanks's history of mental illness is not questioned, and it may be that his illness impaired his judgment and caused him to confess. This alone, however, does not evince the police coercion necessary to demonstrate that Hughbanks's statements to the police were involuntary.[34] "Mere knowledge of [a defendant's] mental condition, standing alone, does not suggest that law enforcement officials resorted to psychological pressure or tactics to induce [a defendant] to make incriminating statements."[35] Further, there is nothing in the record to indicate that Hughbanks's earlier injection of crystal methamphetamine rendered him unable to waive voluntarily hisMiranda rights.
Hughbanks was a thirty-year-old man with some experience in the criminal justice system. We have the tape recording of the entire interrogation process-there are no major ellipses or pauses in the tape-and it reflects good police practice (in Arizona). Would that all interviews here were so recorded-most would, as does the tape here, indicate that proper procedure was followed; but the practice would both allow the detection of improper interrogations when they occurred and prevent unfounded allegations of impropriety when none exists. Hughbanks was provided with the opportunity to smoke and to drink coffee during the interrogation by two police officers. The police made no threats or inducements to him. The interrogation was not unreasonable in length. Hughbanks sounded alert and appropriate on the tape recording of his confession. Under the totality of the circumstances, we conclude that the trial court did not err in concluding that Hughbanks's waiver of his Miranda rights and his confession were voluntary.
XII. Ineffective Assistance of Counsel
In his eleventh assignment, Hughbanks claims he was denied effective assistance of counsel when counsel proceeded on the suppression motion without the assistance of supportive expert psychiatric testimony. In his twelfth assignment, Hughbanks claims he was denied effective assistance of counsel because trial counsel agreed not to require that the state produce as witnesses available for cross-examination the family members who implicated Hughbanks in the murders.
To prevail on a claim of ineffective assistance of counsel, Hughbanks "must demonstrate that his trial counsel substantially violated an essential duty owed to him and that this deficiency prejudiced his defense."[36] To demonstrate prejudice, Hughbanks must show that "he was denied some substantive or procedural right that made the `trial unreliable or the proceeding fundamentally unfair.'"[37] Further, a reviewing court must be highly deferential in reviewing an ineffective-assistance claim and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[38] In Ohio, a licensed attorney is presumed to be competent,[39] and "[d]ebatable trial tactics do not constitute ineffective assistance of counsel."[40]
First, Hughbanks claims that trial counsel was ineffective because counsel failed to provide expert psychiatric testimony regarding the voluntariness of his statements to the police. Trial counsel adequately presented the fact of Hughbanks's mental illness to the trial court through questioning of the police officers. Mental illness, absent coercive police activity, would not have been a sufficient reason to exclude Hughbanks's confession.[41] The voluntariness of Hughbanks's confession depended on whether the police engaged in coercion or misconduct, and not on whether Hughbanks was "totally rational and properly motivated,"[42]
Thus, the failure to call a psychiatrist to testify as to Hughbanks's mental illness, in the absence of evidence of improper police conduct, did not constitute ineffective assistance of counsel.[43]
As to Hughbanks's second claim of ineffective assistance of counsel, he has failed to demonstrate specifically how the agreement to allow other witnesses to testify that Hughbanks's family members implicated him in the murders prejudiced him. Further, trial counsel indicated on the record that the reason he was agreeing not to have those family members called to testify was trial strategy. We will not second-guess strategic decisions of trial counsel, at least insofar as they are reasonable. Hughbanks's twelfth assignment is overruled.
XIII. Other-Acts Evidence
In his thirteenth assignment, Hughbanks claims he was denied a fair trial, when the state was allowed to cross-examine his psychiatrist about a previous domestic-violence incident, a previous term of incarceration, and his failure to support his children. Hughbanks alleges that such questions were prohibited by Evid.R. 404(B).
During his direct examination, Dr. DeSilva testified that, after Hughbanks's mother slapped his face, Hughbanks struck his mother. The trial court, based on that testimony, allowed the state to ask on cross-examination whether Dr. DeSilva knew of any domestic-violence convictions. Dr. DeSilva responded that there had been domestic violence at different times.
Dr. De Silva also testified that Hughbanks's children were important to him, but that because of his illness he was unable to have "emotional time" with them. On cross-examination, the state was permitted to ask if Hughbanks had, in any manner, supported his children. Dr. DeSilva responded that Hughbanks was unhappy that he was unable to do more for his children and that he had tried several jobs, but was unable to keep them.
On direct examination, Dr. DeSilva testified that a bipolar person lacks judgment, is impulsive, and cannot rationally choose to medicate himself. He testified that it is not unusual for a bipolar or schizoaffective person to use alcohol or street drugs to feel better. He testified that a person with Hughbanks's illness needs constant monitoring of his medication and that the only time Hughbanks complied with taking his medication consistently was while he was hospitalized.
The trial court explained that it would allow questions on cross-examination about Hughbanks's previous imprisonments because Dr. DeSilva's testimony indicated that Hughbanks would never be cured. The trial court believed that Dr. DeSilva's testimony provided the state with the opportunity to rebut his conclusion that Hughbanks's illness was incurable by asking about the effect that prison, a form of structured environment, would have on Hughbanks's illness.
On cross-examination, Dr. DeSilva was asked whether he knew that Hughbanks had been imprisoned on past occasions. He responded that he was aware of a driving-under-the-influence charge and that Hughbanks had been in prison once. He was then asked if he was aware of any difficulties that Hughbanks experienced in prison while he was no longer under the influence of alcohol and drugs. Dr. DeSilva responded he did not have the prison records and that his testimony would depend on whether Hughbanks had experienced adequate care in prison. The state informed him that Hughbanks had been incarcerated in Chillicothe Correctional Institution, and the psychiatrist responded that Chillicothe had had limited psychiatric care until recently. He testified that he had not been informed of any problem Hughbanks experienced while incarcerated.
The Ohio Rules of Evidence apply to penalty hearings.[44]
Hughbanks alleges that the purpose of the state in asking DeSilva about the alleged "other acts" was to portray him as having a bad character in violation of Evid.R. 404(B). We disagree. The questions concerning domestic violence and the support of his children were not raised to portray Hughbanks's bad character, but were asked to elicit further information on areas that had been raised on direct examination. "A witness may be properly cross-examined as to all relevant facts developed by the examination in chief."[45]
We are troubled, however, by the trial court's ruling that allowed the state to question Dr. DeSilva about Hughbanks's incarcerations. We do not believe that Dr. DeSilva's testimony that a structured environment like a hospital resulted in Hughbanks taking his medication opened the door to allow the state to ask Dr. DeSilva about the effect of prison on Hughbanks's conduct or to permit the state to use Hughbanks's incarceration to rebut Dr. DeSilva's testimony that Hughbanks was mentally ill. In reviewing the mitigation evidence, however, we are not convinced that the introduction of the fact that Hughbanks had previously been incarcerated prejudiced Hughbanks's rights. Thus, we overrule this assignment.
XIV. Insanity Definition
In his fourteenth assignment, Hughbanks claims that he was prejudiced when the state asked Dr. DeSilva during the mitigation phase of the trial whether Hughbanks met the legal definition of insanity at the time of the murders. The record demonstrates that the state asked Dr. DeSilva for the legal definition of insanity. It then used a report concerning Dr. Schmidtgoessling's insanity examination to impeach Dr. DeSilva's testimony that Hughbanks had been psychotic throughout his life and that he had a major mental illness that affected his judgment.
The trial court instructed the jury that the mitigation factor under R.C. 2929.04(B) (3) required a lack of substantial capacity to appreciate the criminality of Hughbanks's conduct or to conform his conduct to what was legally required. We cannot conclude from the facts before us that Hughbanks was unfairly prejudiced by the state's question concerning the definition of legal insanity.
XV. Independent Review
Having concluded that none of Hughbanks's assignments has merit, we now turn to the independent review mandated by R.C.2929.05. We must review the record to determine whether the evidence supports the finding that the aggravating circumstances were established beyond a reasonable doubt. We next must independently determine whether the aggravating circumstances found by the jury outweigh the mitigating factors. Last, we must determine whether the death sentence is appropriate after considering whether the sentence is excessive or disproportionate to the penalty imposed in similar cases.
Hughbanks was convicted of three aggravating circumstances under R.C. 2929.04: (1) the offense was committed to avoid detection, apprehension, trial, or punishment for another offense committed by Hughbanks; (2) the offense was part of a course of conduct involving the purposeful killing of two or more persons; and (3) the offense was committed by Hughbanks as the principal offender while he was also committing or attempting to commit aggravated burglary.[46] Hughbanks confessed to killing both Mr. and Mrs. Leeman. He admitted that he killed the Leemans to prevent them from identifying him after he was caught in their home. Hughbanks's actions and statements in conjunction with the manner in which he killed the Leemans demonstrate the purposefulness of his act. Thus, we conclude that the evidence supports beyond a reasonable doubt the aggravating circumstances for which he was convicted.
We next must determine whether the aggravating circumstances outweigh any mitigating factors established by Hughbanks. R.C. 2929.04(B) sets forth a list of factors to be considered in favor of the defendant, along with his history, character and background. When the facts warrant it, we may also consider the nature and circumstances of the offense in favor of the defendant.
In addition to his unsworn statement, Hughbanks presented five witnesses. His sister and mother testified about his substance abuse and his neglectful and dysfunctional family. They also provided examples of his depression and suicide attempts. His uncle, through a deposition read to the jury, testified that there was a history of mental illness in the family and that Hughbanks's parents failed to provide the children with the physical necessities of life.
Dr. Raju testified that Hughbanks had been hospitalized twice during the summer of 1986. He diagnosed Hughbanks as having a major affective disorder and a bipolar disorder, as well as suffering from drug and alcohol abuse. He described Hughbanks as experiencing homicidal ideation and ineffective coping skills.
Dr. DeSilva testified that he had treated Hughbanks off and on since Hughbanks was fifteen years of age. He explained Hughbanks's father's mental illness and opined that Hughbanks suffered from a schizoaffective disorder and a bipolar disorder. He explained that when Hughbanks was in the manic phase of his disease, he would feel invincible and grandiose. He described Hughbanks as impulsive and suicidal. He testified that Hughbanks never indicated that he was free of hallucinations or delusions. DeSilva also testified that Hughbanks had expressed fear that he would hurt people when he was angry. He stated that Hughbanks was almost genetically programmed to be schizophrenic or manic-depressive. Although he was unable to say that Hughbanks was "psychotic" on the night of the murders, he did testify that Hughbanks was "psychotic" during that time frame.
The state presented the testimony of Dr. Schmidtgoessling, who conducted two interviews with Hughbanks. She found nothing inappropriate about his behavior or thought processes when she interviewed him. She believed that Hughbanks was "sane" at the time he committed the murders. He told her that he was not having any hallucinations or bizarre beliefs when he committed the murders. He claimed that he was stable, "straight," and functioning. Dr. Schmidtgoessling diagnosed Hughbanks as having a substance-abuse problem, "some sort of a mood disorder," and a character disorder. (It is difficult to conceive of a defendant who commits this type of murder who does not have a "character disorder" at the very least.)
Based on our review of the record and the evidence presented during the mitigation phase, we conclude that Hughbanks did not establish the existence of the R.C. 2929.04(B) (1), (2), or (5) mitigating factors by a preponderance of the evidence. The only mitigating factors warranting any weight are (1) whether at the time of the offense Hughbanks lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law due to a mental disease or defect; (2) Hughbanks's youth; and (3) any other factors relevant to whether he should be sentenced to death.[47]
Neither psychiatrist presented by Hughbanks was able to testify as to his mental capacity on the night of the offenses. At most, we have a diagnosis of Hughbanks's mental illness and testimony that Hughbanks's behavior was generally inconsistent and impulsive, and that he had experienced hallucinations and generalized homicidal ideation. No credible evidence was presented, however, to establish that the murders of the Leemans were a product of his psychological malfunctioning.[48] As we have previously explained, Hughbanks's actions and statements, including his statements to Dr. Schmidtgoessling, indicate that he understood and appreciated what he was doing when he broke into the Leemans' home and purposefully killed them to avoid the consequences of his behavior. Although credible evidence concerning this factor is not particularly substantial, we find that Hughbanks's mental illness as testified to by Drs. DeSilva and Raju is entitled to some weight in mitigation.[49]
We also give some weight to the fact that Hughbanks was twenty when he committed the murders.[50] We consider Hughbanks's history of drug and alcohol abuse, and his dysfunctional family life under R.C. 2929.07(B) (7). His voluntary substance and alcohol abuse deserves minimal weight.[51] His troubled childhood and his general history and background are entitled to some weight in mitigation. We also find that the fact that he has done well in structured environments is entitled to some weight. Hughbanks's remorse, as shown in his unsworn statement, is entitled to some, but very little, weight.[52] The nature and circumstances of the offense do not provide any mitigating value.
Weighing the aggravating circumstances against the mitigation evidence, we conclude that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.
We must next determine if the imposition of the death penalty in this case is excessive or disproportionate to the death penalty imposed in similar cases in this district. While we have not previously decided any cases factually identical to this case, we have compared this case to others that are factually similar,[53]
and we conclude from that review that Hughbank's sentence is neither excessive nor disproportionate.
XVI. Conclusion
We hold that none of Hughbanks's assignments has merit and we uphold his convictions. Our independent review has convinced us that the aggravating circumstances outweigh the mitigating factors. Thus, the trial court did not err in imposing the death sentence. And we conclude that Hughbanks's death sentence is neither excessive nor disproportionate to the death sentence imposed in similar cases in this district.
Judgment affirmed.
 Hildebrandt, P.J., and Shannon, J., concur.
Raymond E. Shannon, retired, of the First Appellate District, sitting by assignment.
[1] State v. Jamison (1990), 49 Ohio St.3d 182, 190,552 N.E.2d 180, 188.
[2] State v. Jenkins (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, paragraph four of the syllabus.
[3] State v. Mason (1998), 82 Ohio St.3d 144, 694 N.E.2d 932, 940, syllabus, certiorari denied (1998), U.S., 119 S.Ct. 624.
[4] Id. at 150, 694 N.E.2d at 943.
[5] See State v. Clemons (1998), 82 Ohio St.3d 438, 443,696 N.E.2d 1009, 1016, certiorari denied (1999), U.S.,119 S.Ct. 816.
[6] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[7] State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717, 720-721.
[8] See In re Sperrow (1976), 49 Ohio App.2d 142, 359 N.E.2d 719.
[9] State ex rel. Reams v. Stuart (1933), 127 Ohio St. 314, 319,188 N.E. 393, 394-395.
[10] State v. Maurer (1984), 15 Ohio St.3d 239, 473 N.E.2d 768,772, paragraph seven of the syllabus.
[11] See State v. Poindexter (1988), 36 Ohio St.3d 1,520 N.E.2d 568, syllabus.
[12] See State v. Lawrence (1989), 44 Ohio St.3d 24,541 N.E.2d 451; State v. Jenkins (1984), 15 Ohio St.3d 164, 473 N.E.2d 264.
[13] See State v. Jenkins, supra; State v. Lawrence, supra.
[14] State v. D'Ambrosio (1993), 67 Ohio St.3d 185,616 N.E.2d 909.
[15] State v. Buell (1986), 22 Ohio St.3d 124, 489 N.E.2d 795.
[16] State v. Stumpf (1987), 32 Ohio St.3d 95, 512 N.E.2d 598.
[17] State v. Henderson (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237.
[18] State v. Lewis (1993), 67 Ohio St.3d 200, 616 N.E.2d 921.
[19] State v. McNeill (1988), 83 Ohio St.3d 438, 700 N.E.2d 596.
[20] State v. Steffen (1988), 31 Ohio St.3d 111, 509 N.E.2d 383.
[21] State v. Morales (1987), 32 Ohio St.3d 252, 513 N.E.2d 267.
[22] State v. Phillips (1995), 74 Ohio St.3d 72, 656 N.E.2d 643.
[23] State v. Bey (1999), 85 Ohio St.3d 487, 709 N.E.2d 484.
[24] See State v. Durr (1991), 58 Ohio St.3d 86, 568 N.E.2d 674.
[25] State v. Eley (1996), 77 Ohio St.3d 174, 179, 672 N.E.2d 640,646.
[26] State v. Edwards (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, paragraph two of the syllabus, vacated as to death penalty (1978),438 U.S. 911, 98 S.Ct. 3147.
[27] Colorado v. Connelly (1986), 479 U.S. 157, 168,107 S.Ct. 515, 522; State v. Cedeno (Oct. 23, 1998), Hamilton App. No. C-970465, unreported.
[28] State v. Cedeno, supra.
[29] State v. Cedeno, supra, quoting State v. Dailey (1990),53 Ohio St.3d 88, 91, 559 N.E.2d 459, 463.
[30] State v. Dailey, supra, at paragraph two of the syllabus.
[31] State v. Cedeno, supra, citing Lego v. Twomey (1972),404 U.S. 477, 489, 92 S.Ct. 619, 627.
[32] Colorado v. Connelly, supra, at 167, 107 S.Ct. at 522.
[33] State v. Carter (1995), 72 Ohio St.3d 545, 552,651 N.E.2d 965.
[34] See Colorado v. Connelly, supra; State v. Knotts (1995),111 Ohio App.3d 753, 677 N.E.2d 358; State v. Malone (Dec. 13, 1989), Montgomery App. No. 10564, unreported.
[35] State v. Knotts, supra, at 758, 677 N.E.2d at 361.
[36] State v. Juarez (July 17, 1998), Hamilton App. No. C-970368, unreported, citing Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052.
[37] State v. Combs (1994), 100 Ohio App.3d 90, 101,652 N.E.2d 205, 211-212, quoting Lockhart v. Fretwell (1993), 506 U.S. 364,370, 113 S.Ct. 838, 844.
[38] Strickland v. Washington, supra.
[39] State v. Hamblin (1988), 37 Ohio St.3d 153, 155-156,524 N.E.2d 476, 479.
[40] State v. McNeill, supra, at 449, 700 N.E.2d at 608.
[41] Accord State v. Smith (1997), 80 Ohio St.3d 89, 113,684 N.E.2d 668, 690, certiorari denied (1998), U.S.,118 S.Ct. 1811.
[42] Colorado v. Connelly, supra, at 167, 107 S.Ct. at 521.
[43] See State v. Peeples (1994), 94 Ohio App.3d 34,640 N.E.2d 208.
[44] State v. Jenkins, supra, at 190, 473 N.E.2d at 289.
[45] State v. Maurer, supra, at 263, 473 N.E.2d at 791.
[46] R.C. 2929.04(A) (3), (5), and (7).
[47] See R.C. 2929.04(B) (3), (4) and (7).
[48] See State v. Berry (1995), 72 Ohio St.3d 354, 366,650 N.E.2d 433, 443.
[49] See State v. Berry, supra.
[50] See State v. Batson (1999), 85 Ohio St.3d 418, 431,709 N.E.2d 128, 139.
[51] See State v. Goff (1998), 82 Ohio St.3d 123, 143,694 N.E.2d 916, 931.
[52] State v. Stojetz (1999), 84 Ohio St.3d 452, 473,705 N.E.2d 329, 346-347, certiorari denied (1999), S.Ct., 1999 WL 507774.
[53] State v. Jones (Aug. 28, 1998), Hamilton App. No. C-970043, unreported; State v. Franklin (Aug. 15, 1990), Hamilton App. No. C-890028, unreported, affirmed (1991), 62 Ohio St.3d 118,580 N.E.2d 1, certiorari denied (1992), 504 U.S. 960, 112 S.Ct. 2315;State v. Campbell (Sept. 4, 1991), Hamilton App. No. C-890330, unreported, affirmed (1994), 69 Ohio St.3d 38, 630 N.E.2d 339, certiorari denied (1994), 513 U.S. 913, 115 S.Ct. 289; State v.Henderson (Jan. 14, 1987), Hamilton App. No. C-850557, unreported, affirmed (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237, certiorari denied (1989), 489 U.S. 1072, 109 S.Ct. 1357; State v. Steffen
(Dec. 11, 1985), Hamilton App. No. C-830445, unreported, affirmed (1987), 31 Ohio St.3d 111, 509 N.E.2d 383, certiorari denied 1988), 485 U.S. 916, 108 S.Ct. 1089.