OPINION
Defendant-appellant David G. Thorne appeals the February 3, 2000 Judgment Entry of the Stark County Court of Common Pleas, which found appellant guilty of one count of complicity to commit aggravated murder with a death specification, and sentenced appellant accordingly. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE CASE AND FACTS
On September 15, 1999, the Stark County Grand Jury indicted appellant with one count of aggravated murder in violation of R.C. 2903.01. The grand jury also added the specification appellant conspired to committed the murder for hire, in violation of R.C. 2929.04(A)(2). At his September 16, 1999 arraignment, appellant plead not guilty to the charge. Appellant was charged with hiring Joseph Wilkes to kill appellant's ex-girlfriend, Yvonne Layne. Ms. Layne was the mother of five children. Appellant was the father of one of Ms. Layne's children, Brandon. Mr. Wilkes confessed he killed Ms. Layne in her home on March 31, 1999. Mr. Wilkes agreed to testify truthfully about the crime and appellant's involvement in the planning of the murder in exchange for a life sentence with possibility of parole after thirty years. A jury trial commenced on January 18, 2000, at which time the following evidence was adduced. On April 1, 1999, Tawnia Layne, the victim's mother, went to Yvonne Layne's home to take one of her grandchildren to school. When she arrived, Tawnia found her daughter's body. Yvonne's throat had been cut, and her body was lying in a pool of blood. Yvonne's five young children were awake in the house. Tawnia Layne called the police. While there were two partial bloody footprints at the scene, there was little other physical evidence. The police were unable to recover any usable fingerprints. Although a knife was recovered from a nearby storm sewer, the knife had been wiped clean. As part of the investigation, the police discovered Yvonne had recently implemented paternity proceedings for her son, Brandon. As a result, appellant was ordered to pay child support in the amount of $358 per month with weekly payroll deductions beginning in March, 1999. By the time of his first payment, appellant owed more than $700 in back support. The Alliance police learned of Mr. Wilkes through Rose Mohr. Ms. Mohr contacted the police to tell them she and her boyfriend, Chris Campbell, had spoken with Mr. Wilkes at the Carnation Mall in Alliance on the night of March 31, 1999. According to Ms. Mohr, Mr. Wilkes told her and Mr. Campbell he was in Alliance because he had been hired to kill a woman. Mr. Wilkes made statements he had purchased a knife at Walmart and showed Ms. Mohr and Mr. Campbell the knife. Ms. Mohr remembered Mr. Wilkes saying he was hired for money to commit the murder "for a guy." In contrast, Mr. Campbell recalled Mr. Wilkes to state his "girlfriend" had paid for a room for him at the adjoining Comfort Inn, this girlfriend had dropped him off, and the girlfriend had asked Mr. Wilkes to commit the murder. In July 1999, Mr. Wilkes confessed to the murder and implicated appellant, claiming appellant paid Mr. Wilkes to kill Ms. Layne. Mr. Wilkes gave details: how appellant planned the murder; provided an alibi for himself; provided Mr. Wilkes with a place to stay before and after the murder; provided transportation to and from that location; and provided money to purchase the batting gloves and the knife used in the murder. Mr. Wilkes testified appellant wanted custody of his son, Brandon, and did not want to pay child support to Ms. Layne. Mr. Wilkes testified he rented a room at the Comfort Inn at Carnation Mall in Alliance on March 31, 1999. He then purchased batting gloves and later a knife at the K-Mart in the mall, walked to Ms. Layne's residence, and committed the murder. He told the police he threw the knife in a storm sewer near the house, and disposed of his gloves in a McDonald's dumpster. The next morning, he claimed appellant picked him up at the hotel and took him to a friend's house. Mr. Wilkes hid his black nylon pants in the woods near his friend's house. He could not recall what he did with his shoes or his shirt. After five days of testimony and deliberation, the jury found appellant guilty of aggravated murder and guilty of the specification appellant conspired to commit murder for hire. On January 27, 2000, a sentencing hearing was held. After hearing the testimony, the jury was unable to reach a verdict as to whether appellant should die for his crime. The trial court declared a mistrial as to the penalty phase of the trial and proceeded to sentence appellant according to State v. Springer (1992), 63 Ohio St.3d 167. In a February 3, 2000 Judgement Entry, the trial court sentenced appellant to a term of life in prison without parole eligibility. It is from this judgment entry appellant prosecutes his appeal, assigning the following as error:
 I. THE JURY'S VERDICT OF GUILTY WAS NOT SUPPORTED BY THE EVIDENCE, OR IN THE ALTERNATIVE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 II. APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.
 I
In his first assignment of error, appellant maintains the jury's verdict of guilty was not supported by sufficient evidence or in the alternative was against the manifest weight of the evidence. We disagree. In State v. Jenks (1981), 61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
Jenks, supra, at paragraph two of the syllabus. When applying the aforementioned standard of review to the case sub judice, based upon the facts noted supra, we do not find, as a matter of law, appellant's conviction was based upon insufficient evidence. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. State v. Thompkins (1997), 78 Ohio St.3d 380, 387 citing State v. Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, syllabus 1. The crime of aggravated murder is proscribed in R.C. 2903.01, which states "no person shall purposely, and with prior calculation and design, cause the death of another * * * . " R.C. 2923.03 governs the crime of complicity, stating: "(A) no person, acting with the kind of culpability required for the commission of an offense, shall doing any of the following:
(1) solicit or procure another to commit the offense[.]"
R.C. 2929.04 precludes the imposition of the death penalty unless certain specifications are stated in the indictment, and proved beyond a reasonable doubt. R.C. 2929.04(A)(2) permits the imposition of the death penalty where an aggravated murder was committed for hire. Appellant maintains the only evidence against him was the self-serving and uncorroborated testimony of Joseph Wilkes. Appellant maintains this evidence was legally insufficient to convict him and was not competent or credible. However, the weight to be given the evidence and the credibility of the witnesses are matters generally within the province of the fact finder. DeHass, supra. At trial, Mr. Wilkes testified he looked at appellant as the big brother he never had, but always wanted. In order to impress appellant, Mr. Wilkes agreed to kill Ms. Layne. Mr. Wilkes testified he and appellant planned the murder. Appellant drove Mr. Wilkes to the Carnation Mall and gave Mr. Wilkes a $100 bill to purchase a motel room, a pair of gloves and a knife for the murder. Mr. Wilkes testified he checked into the Comfort Inn at the mall, and then went to the K-Mart in the mall and bought a pair of batting gloves. Because appellant was in a hurry, Mr. Wilkes waited to purchase the knife. Appellant got back in the car with appellant and they left to run errands. When the two were in the car, appellant instructed Mr. Wilkes to commit the murder at approximately 10:00 p.m. so appellant would have an alibi. Appellant was to attend a martial arts class at that time, and further planned to stop at a convenience store covered by a surveillance camera for further evidence of alibi. After running errands, appellant drove Mr. Wilkes back to the Carnation Mall. Mr. Wilkes returned to his hotel room where he took cocaine and acid supplied by appellant. Thereafter, appellant returned to the K-Mart and bought the knife with which he planned to commit the murder. Mr. Wilkes then went back to his room and waited until the agreed upon time to go to Ms. Layne's house. After committing the murder, Mr. Wilkes disposed of the knife and the batting gloves, ran back to the motel and slept there all night. In the morning, appellant returned to the hotel and drove Mr. Wilkes back to the place he had been staying. Appellant then told Mr. Wilkes he would return in a couple of days to pay him $200 for murdering Ms. Layne. Two days later, on the morning of Ms. Layne's funeral, appellant returned, with his son Brandon in the car, and paid Mr. Wilkes $200. Apparently, appellant then took Mr. Wilkes through a drive-thru to purchase him a twelve pack of Heineken before appellant and his son went to the funeral. We find this was sufficient evidence, if believed, upon which the jury could conclude appellant conspired to commit aggravated murder for hire. Further, we find this testimony was ample, competent, credible evidence upon which the jury could rely in making its determination. Accordingly, appellant first assignment of error is overruled.
 II
In his second assignment of error, appellant maintains he was denied his constitutional right to effective assistance of counsel. Specifically, appellant argues the combined deficient performance of his two defense attorneys deprived him of a fair trial. First, appellant maintains his attorneys failed to secure an additional blood test in a timely fashion. Appellant argues the outcome of the trial would have been different if he had the results of this test. Appellant also maintains the "majority" of defense counsels' cross examinations were unorganized, confusing, and with no apparent purpose. The standard of review of an ineffective assistance of counsel claim is well-established. Pursuant to Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052,2064, 80 L.Ed.2d 674, 673, in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance, and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial court would have been different. State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373; State v. Combs, supra. As to appellant's first contention with regard to the blood test, we find appellant must fail on the second prong of the Strickland test. Appellant cannot demonstrate with record evidence either the results of the test or how such unknown results could have resulted in the outcome of the trial being different. As to appellant's allegations his attorneys were unorganized or confusing, we find appellant fails under the first prong of Strickland test. In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley, 42 Ohio St.3d at 142. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id. In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Bradley, supra at syllabus paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. Finally, a reviewing court "will not second-guess trial strategy decisions." State v. Mason (1998), 82 Ohio St.3d 144, 157. We note appellant makes no specific reference to the record to demonstrate error, but rather states his counsel had a "lack of focus," and conducted generally disjointed cross-examinations, and opening and closing remark. Appellant also takes issue with the witnesses his trial counsel chose to call. We have reviewed these portions of the transcript and find trial counsel's questions, arguments, and representation meet the standard required by the first prong of Strickland. Accordingly, appellant's second assignment of error is overruled.
The February 3, 2000 Judgment Entry of the Stark County Court of Common Pleas is affirmed.
 ______________________ Hoffman, P.J.
Farmer, J. and Reader, V.J. concur